IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DWAYNE CROPPER,                      )
    Plaintiff,                   ) C.A. No. 1:20-cv-00921-SB
v.                                   )
                                 ) Jury Trial Demanded
MEGAN N. MCCARTHY, et al.,           )
    Defendants.                  )


**APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
TO THE DEFENDANTS' MOTION TO EXCLUDE PORTIONS
OF THE TESTIMONYAND REPORTS OF PLAINTIFF'S
EXPERT BRIAN FISCHER**


**CONFIDENTIAL – FILED UNDER SEAL**

**REDACTED VERSION**


**GRADY & HAMPTON**
/s/Stephen A. Hampton
Stephen A. Hampton (#2451)
James J. Woods, Jr. (#2035)
6 N. Bradford Street
Dover, DE 19904
(302) 678-1265

*Attorneys for the Plaintiff*

July 29, 2022

## **TABLE OF CONTENTS**

### **APPENDIX**

Deposition Transcript of Brian Fischer dated 4/22/22 (Excerpt).............. PA1

Deposition Transcript of Jodie Hunter dated 8/15/18 (Excerpt)............. PA11

Deposition Transcript of Robert Mock dated 6/22/21 (Excerpt) ............ PA21

Deposition Transcript of Cpl. Megan McCarthy
    dated 9/29/21 (Excerpt)........................................................................ PA30

Deposition Transcript of Diane Metzger dated 8/15/18 (Excerpt).......... PA33

Deposition Transcript of Franchot Wallace dated 6/16/21 (Excerpt) ..... PA35

Deposition Transcript of Jahi White dated 8/6/21 (Excerpt) .................. PA36

Deposition Transcript of William Curtis Howard, III
    dated 6/2/21 (Excerpt).......................................................................... PA37

DOC Medical Record of Dwayne Cropper
    dated 10/3/2000 (Excerpt)..................................................................... PA38

Brian Fischer - April 22, 2022

---

13

1  were building the facilities, were
2  staffing the facilities, for dealing
3  with the environmental agencies,
4  basically coordinating the opening of
5  about a dozen correctional facilities.
6      Q.   And the next, 1991 to 2000 you
7  were the superintendent of Queensboro
8  Correctional Facility?
9      A.   That's correct.
10     Q.   Queensboro is in Queens,
11 question mark?  I wasn't sure.
12     A.   Queensboro is in Queens, on
13 Van Dam Street in Queens, New York.
14     Q.   Because I'm from Brooklyn, so
15 I was, like, I wonder where this is
16 from.  Okay.
17     A.   As you see, it was a
18 multidisciplinary -- it's a work
19 release facility where individuals
20 from state prisons who qualify for
21 work release were sent down to
22 Queensboro, and we would let them out
23 every day, every couple of days, kind
24 of a transitional treatment program.

---

14

1          And my job particularly,
2  though, at Queensboro was to create
3  and implement the whole work release
4  program.  I was able to computerize it
5  so that we know who left and who came
6  back and where they were working and
7  all that stuff.
8          And I was also coordinating
9  the work of other state prisons in New
10 York City that were also dealing with
11 both work release and general
12 populations.
13     Q.   And then from 2000 to 2007 you
14 were the superintendent at Sing Sing?
15     A.   That's correct.
16     Q.   Can you just, please --
17     A.   Sure.  That's a 1,750-bed
18 maximum security facility, and my role
19 was basically to manage Sing Sing in
20 all aspects, security, administration,
21 programs.  Basically it's running a
22 large maximum security prison.
23          The uniqueness about Sing
24 Sing is that it's very close to New

---

15

1  York City, so we were able to have a
2  very diverse population of staff as
3  well as offenders.
4          And I spent a lot of time
5  dealing with the offenders in terms of
6  working with mental health programs,
7  college programs, nonprofit programs
8  to provide treatment at Sing Sing.
9      Q.   So in Delaware we have the
10 warden and then the deputy warden.  Is
11 superintendent the equivalent of a
12 warden or a deputy warden or something
13 under that chain of command?
14     A.   A superintendent in New York
15 is a warden everyplace else.
16     Q.   Understood.  So deputy
17 superintendent would mean deputy
18 warden?
19     A.   Deputy warden, yes, that's
20 correct.
21     Q.   You would have answered to a
22 superintendent as the deputy warden?
23     A.   Correct.
24     Q.   And then 2007 to 2013 you were

---

16

1  the commissioner of the Department of
2  Corrections in New York State.
3      A.   That is correct.
4      Q.   Explain that role.
5      A.   Well, I would call it a
6  management job overseeing, at that
7  time there was a population of 64,000
8  offenders.  We had 13 -- I closed 13
9  correction facilities.
10         Basically overall
11 management, policymaking, budget
12 issues, leadership quality, you name
13 it.  It's basically running a state
14 agency under the direction directly
15 under the governor.
16     Q.   I remember these governors.
17         Okay.  I believe I read
18 that you were retired.  Are you
19 retired, or are you employed?
20     A.   I am retired.
21     Q.   Let's do teaching experience.
22 So this is page 3.
23         So it looks like you were
24 an adjunct professor at John Jay in

---

Brian Fischer - April 22, 2022

---

37

1  A.   On the factual, primarily from
2  the complaint, original complaint, and
3  then after reading -- basically the
4  complaint.
5  Q.   Circumstances leading to the
6  incident, can you tell me, what
7  materials did you review to write this
8  section here?
9  A.   That would be the complaint
10 itself, and by this time I believe I
11 had looked at some of the depositions.
12 Also, again, that particular stuff
13 also comes from your incident reports.
14 Q.   Cell extraction action
15 detailed on page 4, what materials did
16 you use to create this section?
17 A.   That particularly is your
18 incident reports.
19 Q.   And then eye injury and
20 medical notes, what materials did you
21 use and review to create this section?
22 A.   You had documents from the
23 medical unit included in the material
24 submitted by the defendants.

---

38

1  Q.   In the first paragraph, last
2  sentence, you wrote, "More than just
3  his eye being injured, numerous other
4  injuries as a result of being hit with
5  pepperball projectiles are seen."
6       Can you explain what you
7  mean by that?
8  A.   Yeah.  There was a report from
9  a nurse particularly who basically
10 mentioned or detailed the number of
11 bruises that she saw on the body of
12 the defendant.
13 Q.   Do you remember the nurse's
14 name?
15 A.   Not offhand, no.  But it was
16 in the actual documents that were
17 submitted.
18 Q.   And in the last paragraph,
19 last sentence you wrote, "To date
20 Mr. Cropper has a permanent near total
21 loss of vision in his right eye."
22      Can you tell me what you
23 used to create this sentence?
24 A.   I believe this comes from the

---

39

1  amended complaint.
2  Q.   Is it fair to say that you are
3  not a medical professional?
4  A.   That is fair to say.
5  Q.   So in the use of force options
6  you wrote that there are three
7  approaches to remove an unwilling
8  inmate from his or her cell.  Would
9  you agree with that?
10 A.   That's correct.
11 Q.   You saw the video and you read
12 the incident reports.  Would you
13 characterize Mr. Cropper as an
14 unwilling inmate?
15 A.   Yes.
16 Q.   So the three approaches you
17 talked about is you could either talk
18 to the person, or you can go to the
19 cell and physically secure the person,
20 or you can use chemical agents to
21 incapacitate the person before
22 entering the cell.
23      And I think you also
24 offered a fourth option, to leave the

---

40

1  person in the cell until he or she can
2  calm down or allow staff who knows the
3  person to talk to the inmate.
4       Would you agree these are
5  the four approaches that you offer?
6  A.   It is.
7  Q.   Can you tell me, what is this
8  based on?  How did you come up with
9  these four approaches?
10 A.   Well, personal experience.  I
11 have talked to people out of their
12 cell.  I've had what we call our CERT,
13 a group of trained officers, go into a
14 cell and take somebody out.  I have
15 authorized chemical agents.
16      But the fourth option is
17 the one that, as a warden at Sing Sing
18 in particular, that I tried to use the
19 most, and that is not every incident
20 has to occur immediately.  Not every
21 situation is insurmountable where you
22 have to do something.  Many times,
23 especially with an agitated
24 individual, offender, it's best to let

---

Brian Fischer - April 22, 2022

---

**41**

1  some time occur.
2        From my experience, here's
3  what happens:  The individual
4  offender, he's confronted by staff.
5  Now, he knows he's going to be removed
6  from the cell.  There's no discussion.
7  It's going to happen.
8        The question becomes does
9  it have to happen right now?  Are
10 there other ways of getting him out?
11 Are there other options that we could
12 be using before we go in and get him?
13 For me, again, based on experience,
14 time elements can be critical and also
15 can be used.
16       So when I say the fourth
17 option is not used often enough, I
18 really believe this.  You could
19 leave -- and in this case, in my
20 opinion, in this case that lends
21 itself to leaving him alone for a
22 while.  He's not going anyplace.  So
23 that's an option that is available.
24       And, again, it doesn't

---

**42**

1  eliminate it, but it puts off the
2  actual necessary use of force if you
3  can do it that way, if you can get him
4  to walk out.
5     Q.  Hypothetically, what if the
6  person is not calming down after a few
7  hours?  Then what?  What would your
8  proposed option be?
9     A.  Well, then you have to decide,
10 he's not going to come out, then you
11 have to decide on what's the best
12 approach to remove him from the cell.
13 And then you have to look at who he
14 is, who you have working behind you in
15 terms of your team.
16       If you have to do it, then
17 you make the call that he has to come
18 out.  Fine.  And then the question
19 then becomes what's the best option on
20 terms of how to get him out of the
21 cell.
22    Q.  In Delaware there's a term
23 called a quick response team or a QRT.
24 Are you familiar with this term?

---

**43**

1     A.  Yes, I am.
2     Q.  In your experience when you
3  were employed with the New York State
4  DOC, did they have something similar?
5     A.  Yes.  We had, we call them
6  correctional response -- correctional
7  emergency response team.
8     Q.  So like CERT?
9     A.  Same concept.
10    Q.  Same concept.  Okay.
11       I know you were the warden,
12 but were you ever part of a CERT team?
13    A.  No.  Well, that's -- no.  Yes
14 and no.  I was not a member of the
15 team, but I was the supervisor of a
16 team, so that kind of makes me part of
17 the team.
18    Q.  So when you say supervisor, so
19 when you were supervisor, what were
20 you doing, like what was your --
21    A.  The, again, example of an
22 actual experience, I had an individual
23 in a cell at Sing Sing who needed to
24 come out, and our CERT team was

---

**44**

1  deployed, and I was on the scene
2  because I tried talking him out at
3  first.  So it was on my orders that
4  the team went in.
5     Q.  And this, I guess, must have
6  been between 2000 and 2007?
7     A.  Correct.
8     Q.  So how many times as a
9  supervisor were you involved in a CERT
10 team?
11    A.  Probably, directly involved,
12 probably three.
13    Q.  So that one time that you were
14 talking about where you were trying to
15 use that fourth option, trying to talk
16 to the person to de-escalate their
17 emotions, I'm sorry, was that
18 successful?  Were you able to calm
19 them down?
20    A.  No, I was not.
21    Q.  Then what happened afterwards?
22    A.  He needed to be removed for,
23 in his case, mental health services,
24 and I ordered the team in to basically

---

Brian Fischer - April 22, 2022

---

**45**

1   remove him physically.
2   Q.   And were they able to do that?
3   A.   Yes.
4   Q.   Can you tell me a little bit
5   more about the two other instances
6   where you were the supervisor of a
7   CERT team, if you can remember?
8   A.   We had a cell block where we
9   believed that there was a cell phone
10   inside the cell block, and I
11   authorized the team to go in and do
12   what amounted to be was a full search
13   of the cell block, cell unit.
14       And the third one was
15   following an incident where one
16   offender stabbed another offender. We
17   had the team go in and, again, take
18   control of a certain area within the
19   cell block.
20   Q.   Have you been involved in a
21   situation where use of force was used
22   on an inmate?
23   A.   Sure. Yes.
24   Q.   How many times would you say?

---

**46**

1   A.   Where I was physically there
2   in the incident?
3   Q.   Yes.
4   A.   Probably no more than three to
5   five times.
6   Q.   And the reason why I ask these
7   questions, sir, is just to get an idea
8   of the range of your professional
9   experience because I can only know so
10   much from a paper resume.
11       So we talked about the
12   three times involving a CERT
13   extraction. If you can remember, can
14   you tell me what the incidents were
15   where use of force was employed on an
16   inmate those three to five times?
17   A.   It was usually following a
18   fight between offenders or -- I'm
19   trying to think. In one case it was
20   he didn't want to be transferred.
21   Q.   Transferred?
22   A.   Unvoluntary transfer out of
23   Sing Sing to another facility.
24       And then the more typical

---

**47**

1   one was -- is when an individual
2   offender commits a violation and has
3   to be placed in special housing,
4   remove them from a regular cell in a
5   housing unit and then place them in
6   special housing, which is another cell
7   block area.
8   Q.   During your time with New York
9   State DOC did your employees use
10   pepperball launchers?
11   A.   No, we did not use launchers.
12   Q.   So pepperball launchers was
13   not a thing in New York when you were
14   the commissioner?
15   A.   Right, that's correct.
16   Q.   So you've never been trained
17   to use a pepperball launcher?
18   A.   That's correct.
19   Q.   That cuts like five questions
20   out. So you personally have never
21   held a pepperball launcher?
22   A.   No.
23   Q.   Do you have any personal
24   experience with a pepperball launcher?

---

**48**

1   A.   No.
2   Q.   Now, are you aware that the
3   Delaware DOC has a use of force
4   policy?
5   A.   I am.
6   Q.   Did you get a chance to look
7   at that?
8   A.   Yes.
9   Q.   Did you use that to help you
10   compile this expert report?
11   A.   I did, their Policy 8.30.
12   Q.   Are you familiar with the
13   Delaware DOC's alternative methods to
14   extract an emotionally charged inmate
15   that doesn't involve the QRT?
16       I can rephrase that if that
17   doesn't make sense.
18   A.   Please rephrase.
19   Q.   Sure. Are you aware if the
20   Delaware DOC used any other way to
21   extract an emotionally charged inmate
22   without the use of a QRT?
23   A.   No, I'm not aware.
24   Q.   You watched the video. Do you

---

Brian Fischer - April 22, 2022

---

49

1  remember the part where Lieutenant
2  Wallace is asking Mr. Cropper to come
3  out of his cell and cooperate at least
4  two times?
5    **A.   That's correct, yes.**
6    Q.   This part about the pepperball
7  launchers on page 6 and 7 of your
8  expert report, can you tell me, what
9  is this based on, this section?  What
10  materials did you use to compile this
11  section here?
12    **A.   It was exclusively your own**
13  **department's documents, 1760 to 1831.**
14    Q.   So then critical observations
15  of actions and decisions, this is page
16  7, we'll go by paragraph.  Decision to
17  move the plaintiff, what materials --
18  actually, what did you use to create
19  this section?  For example, was this
20  based on your experience, or was this
21  based on something else?
22    **A.   It's based on my experience**
23  **because even as a warden and then as**
24  **commissioner, one of the things that**

50

1  **occurs after all uses of force in any**
2  **system is a kind of after-incident**
3  **review.**
4    **And what you always are**
5  **doing after -- in that review is to**
6  **ask the question did everybody do what**
7  **they should have done?  Were there**
8  **other options that could have been**
9  **done?  Did every decision they make,**
10  **was it the right decision, or could it**
11  **have been another decision?**
12    **So based on my experience,**
13  **this is like an after-incident review.**
14  **You have all the material.  You saw**
15  **what happened.**
16    **The question becomes if you**
17  **go through the process, everything**
18  **they do, did they do it by policy?**
19  **Did they do it the right way?  Did**
20  **they do it the wrong way?  Could they**
21  **have done something else?**
22    **This is how you develop**
23  **what I would call your after-incident**
24  **review, which is pretty much what**

51

1  **you're seeing in front of you.**
2    Q.   Same question for involvement
3  of Sergeant Mock.  What did you use to
4  create this section?
5    **A.   That was basically both the**
6  **incident reports, Sergeant Mock's own**
7  **testimony or his depositions.**
8    **You've got -- here you've**
9  **got the sergeant, who's the one who**
10  **knows the offender.  He does the cell**
11  **search.  He finds the contraband.  He**
12  **knows who the defendant is and has**
13  **words with him, and obviously the**
14  **defendant is really not very happy**
15  **with him.**
16    **And then as a member of the**
17  **QRT team, he's the one who picks up or**
18  **was assigned, he was assigned the**
19  **pepperball launcher with really a**
20  **limited experience with it.**
21    **So for me, again, you can't**
22  **help but ask yourself the question was**
23  **Sergeant Mock really the best person**
24  **to be the pepperball launcher person**

52

1  **given his interaction with the**
2  **offender?**
3    Q.   So from the video, do you
4  recall seeing the part where
5  Lieutenant Wallace again is trying to
6  ask Cropper to cooperate?  Before the
7  QRT team goes in, do you remember that
8  part where Lieutenant Wallace asks him
9  are you going to cooperate, are you
10  going to come to the door?
11    **A.   Correct.  Yes.**
12    Q.   And do you remember the part
13  where Mr. Cropper was very loud and he
14  refused to comply with that order?  Do
15  you remember that part?
16    **A.   I remember that.**
17    Q.   Would you agree that
18  Mr. Cropper was already emotionally
19  charged even before Lieutenant Wallace
20  opened the door and Sergeant Mock was
21  there with the pepperball launcher?
22    **A.   I would agree with that.**
23  **However, again, my experience, it's**
24  **what offenders do when confronted by**

Brian Fischer - April 22, 2022

53

1    security.  There is part of it is
2    bravado.  Part of it is just being who
3    they are and angry people.
4            So no one should be
5    surprised by an offender who in
6    language would be pissed off at the
7    security people.  It's just, it kind
8    of goes with the nature of the beast,
9    so that his behavior was -- he was
10   agitated, no question, but it was not
11   -- should not have been unexpected.
12   Q.    The next section, use of QRT
13   team, what materials did you use to
14   form this section?
15   A.    Their use of force policy.
16   Q.    And here you wrote that it had
17   the opposite effect.  The QRT team had
18   the opposite effect.  "Mr. Cropper's
19   anger and attitude toward staff only
20   intensified."
21           Do you remember where you
22   got that information from?
23   A.    No.  That is based on my
24   experience with dealing with offenders

54

1    who are being confronted by security
2    staff.  You know it's going to happen.
3    You kind of wait for it, and all the
4    things that occur just simply follow
5    along.
6            A show of force is often a
7    -- in some cases show of force works
8    with individuals.  They don't want to
9    fight.  But a show of force also
10   creates a bigger, a higher level of
11   anxiety and anger on the part of the
12   offender.
13           So it works -- sometimes it
14   works for you, and many times it works
15   against you because now the offender,
16   in his case, he knows it's going to
17   happen, so now he's going to get his
18   back up to the wall even more because
19   he sees the team coming in.
20           So in my opinion a show of
21   force does not always work in the
22   advantage of the security people.
23   Q.    Next, use of a pepperball
24   launcher, is this based on the

55

1    Delaware Department of Correction's
2    training materials that you referred
3    to earlier?
4    A.    Correct.
5    Q.    Next section, firing on a
6    moving person, what materials did you
7    use to form this section here?
8    A.    That's also in the training
9    material.
10   Q.    The physical intervention
11   part, what materials did you use to
12   form this section?
13   A.    The incident reports.
14           (A discussion was held off
15   the record.)
16           (A brief recess was taken.)
17   BY MS. SONG:
18   Q.    Moving on to summary opinion
19   of actions taken, can you tell me
20   what --
21       MR. HAMPTON:  Did you want
22   to put that back up?
23           MS. SONG:  Yes.  Sorry.  I
24   did.

56

1    BY MS. SONG:
2    Q.    Actually, before I even start
3    asking, Mr. Fischer, we just came back
4    from a short break.  Did you talk to
5    your attorney at all during this
6    break?
7    A.    No, I did not.
8    Q.    Moving on, summary opinion of
9    actions taken, what materials or what
10   helped you create this portion of your
11   report?
12   A.    This was kind of reviewing
13   everything I read before trying to
14   summarize based on my experience what
15   it was that happened.
16           Again, the end result is
17   known, so the question becomes for me,
18   if I was still a warden at a place
19   like this, the question becomes why
20   did the individual become injured, and
21   was there things that could have been
22   done that would have prevented it,
23   and/or in the future did we learn
24   something about what could have been

Brian Fischer - April 22, 2022

**57**

1  done to prevent it in the future.
2          That's the kind of way of
3  looking at a summary of events, what
4  happened, could it have been
5  prevented, and can we do something
6  about it to make sure it doesn't
7  happen again, if in fact something bad
8  happened.
9      Q.   Why don't we dive a little
10  deeper in that.
11          So basically what you're
12  saying is if the officers had done
13  some things a little differently,
14  Mr. Cropper would not have sustained
15  an injury.  Is that fair?
16     A.   That is fair to say, yes.
17     Q.   And one of the things I think
18  you mentioned here is that they could
19  have given Mr. Cropper some time to
20  calm down?
21     A.   That's correct.
22     Q.   Or have a mental health staff
23  person intervene.  Is that correct?
24     A.   That's correct.  Because this

**58**

1  is unusual, again, a little bit
2  unusual.  The defendant, Mr. Cropper,
3  is already in special housing unit.
4  In other words, he's already in a
5  secure unit, secure cell.  His cell
6  has already been searched.
7          So what you're doing is
8  you're moving him from a secure cell
9  in one part of this building to
10  another secure cell in the same
11  building.  So the question becomes is
12  it really necessary to move him right
13  then and there?
14          As far as the mental health
15  piece goes, that's clearly, in my
16  opinion, a serious breach in that
17  he's -- he has a known mental health
18  issue.  The sergeant is well aware of
19  that.  The sergeant acknowledges that.
20          So the question becomes
21  you've got a highly agitated person in
22  a secure cell.  He's going to be moved
23  to another secure cell.  He has a
24  mental illness.  Why rush?  Why not

**59**

1  have mental health come in and talk to
2  him?  He's not going anyplace.
3          If he was in a dormitory,
4  if he was in a different kind of cell
5  block where other inmates are
6  wandering around, it may be different.
7  But here he is in a secure cell block,
8  secure cell in a secure cell block,
9  and he's simply, he's being moved to
10  another cell.  He's not being moved to
11  another building even, another
12  location.
13          So that to me -- and again
14  this is where the issue of mental
15  health I think raises its head.  Why
16  not call mental health, which is part
17  of their protocol?  The department's
18  own protocol calls for mental health
19  to come.
20          Maybe they could have
21  settled him down.  Maybe they
22  couldn't.  But at least, at the very
23  least, the protocol requires that
24  staff should call for mental health

**60**

1  review.
2      Q.   When you say protocol, what
3  are you referring to specifically?
4      A.   I believe that's part of their
5  use of force policy.
6      Q.   Last paragraph of page 9 you
7  talk about, "Once in place, there is
8  really no turning back."
9          Can you tell me what you
10  meant by this statement?
11     A.   Once you bring out your QTR
12  unit, once you bring out a team to
13  remove somebody, you really, you have
14  to continue.  It's a prison setting.
15  You don't back down.  That's part of
16  the problem on both sides.  The
17  offender can't back down, and the
18  staff can't back down.
19          You created a situation
20  where something has to occur.  And the
21  best solution is for the offender to
22  back off, come out of the cell, and be
23  escorted.  That's the best.
24          But once you're got your

Brian Fischer - April 22, 2022

---

**73**

1  available to the department and the
2  officers other than the pepperball
3  launcher. And, again, in my opinion,
4  as I said, would not have occurred if
5  the pepperball launcher had not been
6  used; however, it was.
7          The fact that Sergeant Mock
8  says he didn't aim for his head, for
9  the offender's head, yes, he didn't
10  aim for it, but he was, in fact,
11  firing a series of projectiles at a
12  very fast rate in and around an
13  individual who was jumping around.
14          The probability of hitting
15  something other than what you aimed
16  for is increased by the rapid nature
17  of the launcher and by the offender
18  jumping around, the target jumping
19  around, so that a combination of the
20  use of the launcher, the action on the
21  part of the offender led,
22  unfortunately, to him being injured by
23  the projectile that was used.
24      Q.    So let's just say

---

**74**

1  hypothetically that we have the same
2  set of facts here. Mr. Cropper is
3  upset. The officers found three pens
4  wrapped together in his cell and tried
5  to move him to another unit.
6          Same set of facts,
7  Mr. Cropper is upset, he doesn't want
8  to move, QRT team is called. Let's
9  just say that the pepperball launcher
10  had not been used and there was no
11  injury to the eye, but the QRT team
12  did go in and subdue him.
13          How would you rate that
14  extraction? Would you think that it
15  was okay? Would it have been
16  acceptable to you?
17      A.    If they had gone in and
18  removed him without injury, then it
19  would be acceptable because they
20  followed their own policy and no one
21  was injured.
22      Q.    And you saw the video and you
23  read the reports. You said he was
24  jumping, so you would agree that

---

**75**

1  Mr. Cropper was moving up and down
2  with the blanket during this incident?
3      A.    Yes, he was.
4      Q.    Is it possible that if he
5  hadn't been moving up and down with
6  the blanket, then he might have not
7  sustained an injury?
8      A.    That's possible. But then
9  you're blaming the victim for --
10      Q.    I'm not victim blaming, just
11  positing it as a possibility.
12          MR. HAMPTON: One at a
13  time.
14          MS. SONG: Sure. Sorry.
15          THE WITNESS: Yes,
16  Mr. Cropper was in fact jumping
17  around. But, again, we're talking
18  about an incident inside a prison
19  where there's -- there should be the
20  expectation on the part of staff that
21  the offender is going to do something
22  outrageous, the offender is not going
23  to cooperate.
24          It's the job of the

---

**76**

1  security staff to be more
2  professional, if you would, in the
3  situation and guard against
4  unnecessary uses of force, unnecessary
5  injuries.
6          It's not the job of the
7  offender to behave. It's the job of
8  the security staff to manage the
9  situation.
10  BY MS. SONG:
11      Q.    And in your concluding opinion
12  you wrote, "Its use," and by its you
13  mean the pepperball launcher, the
14  pepperball launcher use "and by whom,
15  demonstrate a failure on the part of
16  the defendants to use, as required,
17  the least amount of force to resolve a
18  situation to prevent injury to anyone
19  involved."
20          Can you just explain what
21  you mean by that statement?
22      A.    Well, in my opinion, when you
23  look at the use of a launcher, that's
24  the, to me, that's the extreme in

---

Brian Fischer - April 22, 2022

77

1  terms of the use of force.  You have
2  the physical force, you have chemical
3  agents other than the launcher, and
4  then the launcher.
5          The launcher is really the
6  most dramatic of the uses of force
7  that was available to the staff.  They
8  could have used a handheld spray,
9  which they did ultimately.  They could
10  have just gone in and physically taken
11  him down.
12          But the launcher itself in
13  terms of degrees of use of force is
14  the highest because you're having a
15  weapon.  That's what it is.  It's a
16  weapon used against a single
17  individual in a closed environment,
18  meaning a cell.
19          So that's my opinion that
20  it wasn't necessary.  They could have
21  done the job with less use of force by
22  not using the pepperball launcher.
23  Q.   The Delaware DOC, let's just
24  say hypothetically they have an

78

1  unwilling inmate and they can just use
2  the pepperball launcher around the
3  wall and the ceiling to gain
4  compliance.
5          Would you consider that an
6  acceptable method to gain compliance
7  and the QRT team doesn't even have to
8  go in?
9  A.   If it was successful, yes.
10  But I also question the use of a
11  pepperball launcher in a cell because
12  the nature of the cell, the confined
13  area, to me, using a launcher that
14  spews out projectiles at a very, very
15  rapid rate is to me counterproductive.
16  It's too risky.
17          If it was an open area and
18  you were in a dormitory and you're
19  doing the walls or whatever, maybe.
20  But in a cell, I question the value of
21  a launcher inside a cell with a single
22  individual there who was jumping
23  around and moving around.
24  Q.   You wrote, "Staff placed

79

1  operational concerns over the safety
2  concerns of the plaintiff."
3          What do you mean by that?
4  A.   Where?  I'm sorry.
5  Q.   Sorry.  So it's the second to
6  last sentence in your last paragraph.
7  A.   Yes.  Staff placed -- yes.
8  This occurs because the staff had a
9  policy to follow, and they followed
10  their policy, they followed what they
11  believed to be their job over the
12  concerns of the safety concerns of the
13  offender.
14          Now, their job was to go
15  get him by any means possible or
16  doable, so therefore they really
17  didn't consider the safety issues,
18  particularly because a launcher was
19  involved.
20  Q.   If you were the supervisor of
21  the QRT team here, what would you have
22  done?
23  A.   You mean before the incident?
24  Q.   Starting from Lieutenant

80

1  Wallace saying, "Come to the door.
2  Are you going to cooperate?"
3          "No."
4          In that instance if you're
5  the supervisor of this QRT team, what
6  would you have done?
7  A.   If I was in that environment,
8  if I was standing there as a
9  supervisor, knowing who the offender
10  really is, I would have certainly
11  asked for mental health to come in.
12          I think that would have
13  been the first thing I would have
14  done, asked for mental health
15  intervention.  That might have calmed
16  him down enough that he would have
17  come out or he would have been at
18  least less agitated before we brought
19  in the team.
20          If mental health could not
21  calm him down, I probably would have
22  sent a team in with -- I'm sure one of
23  them would have a handheld pepper
24  spray, only because it's quick, it's

Brian Fischer - April 22, 2022

---

85

1  what other options were available that
2  could have been used, again, to
3  prevent the incident from occurring.
4          MS. SONG:  I don't have any
5  other questions for you, sir.  I don't
6  know if Mr. Hampton has follow-up.
7          MR. HAMPTON:  Yes.  I have
8  a few.  And I'll wait till you take
9  down the document.
10         MS. SONG:  Yes.  Sorry.
11 Let me stop sharing.  Okay.
12         MR. HAMPTON:  Thank you.
13 BY MR. HAMPTON:
14  Q.    Mr. Fischer, you've read the
15 deposition of Sergeant Mock.  Did you
16 pick up in the deposition where he
17 admitted that he did not think that
18 Cropper would cooperate even after
19 they used the pepperballs?  Do you
20 recall that part of his testimony?
21  A.   I do.
22  Q.    Knowing that he didn't believe
23 that shooting the pepperballs would
24 work, what was the point of shooting

---

86

1  the pepperballs?
2   A.   I figure he was -- he was
3  assigned that task, and he followed
4  protocol, which means he did use it.
5  I don't believe he had an option, but
6  he certainly understood that the use
7  of the pepperball spray probably
8  wouldn't work, but he was going to use
9  it anyway.
10  Q.    Is using it anyway more in the
11 line of retaliation or abuse as
12 opposed to anything else?
13  A.   Well, I think he -- there's
14 clearly some animosity between the
15 officer and the offender, so, again,
16 you've created it -- they created a
17 situation where the officer, Sergeant
18 Mock, had a weapon in his hands, and
19 he was dealing with an agitated and
20 angry offender who, between the two of
21 them, probably didn't like each other.
22          So there was a situation
23 where I believe the launcher added to
24 the problem and ultimately ended with

---

87

1  the injury occurring.
2   Q.    I guess what I'm asking, would
3  it appear in this case that they used
4  a weapon, as you describe it, in a
5  situation in which the person using
6  the weapon didn't believe it would
7  work?
8   A.   Yes.  That's probably a good
9  summary.  Therefore, the use of the
10  weapon, knowing or believing that it
11  wasn't going to work, really is
12  contrary to good professionalism.
13  Q.    When he was using the
14 pepperball launcher and he talked
15 about shooting at the fingers that
16 were holding up the blanket, would you
17 agree with me that the fingers were
18 relatively close to the face, less
19 than a foot away from the face maybe?
20  A.   I'm sure.  The problem with
21  holding up the blanket, even with his
22  fingers showing, what Cropper
23  basically did was he left himself open
24  for the launcher because the only

---

88

1  thing that Sergeant Mock could see was
2  his legs, his hands, and his head.
3   Q.    But shooting at his hands,
4  which are relatively close to his
5  face, when Cropper is bouncing and
6  jumping around, in a case like that,
7  would it be foreseeable that he could
8  get hit in the eye with a pepperball?
9   A.   Absolutely.
10  Q.    And did you pick up from the
11 testimony of Mock and some of the
12 others that of all of the options they
13 had to try to bring Cropper out, the
14 only one that could likely result in a
15 serious injury like an eyeball being
16 put out was the pepperball launcher?
17  A.   Yeah.  The nature of the
18  injury almost directly -- doesn't
19  almost.  It does directly relate to
20  the pepperball launcher and the
21  projectile that comes out of that
22  launcher.
23  Q.    Would there be a word you
24 would use to describe using the

---

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

| Jodie Hunter | Page 5 |

1   job title, please.
2       A.   My name is Jodie Hunter, and
3   my job title is Training Academy
4   Administrator for the Delaware Department of
5   Correction, often referred to as the
6   Training Director, just because it's a
7   little simpler.
8       Q.   And where are you sitting
9   today as you are having your deposition
10  taken?
11      A.   I'm here at the Department of
12  Correction Administration Building in one of
13  our conference rooms.
14      Q.   All right. And you have been
15  asked to give an opinion in this case that
16  Mr. Cropper brought against some
17  correctional officers, including now
18  Lieutenant Mock. Correct?
19      A.   That's correct.
20      Q.   Would you consider yourself an
21  unbiased expert in this case?
22      A.   Absolutely.
23      Q.   Have you ever given any
24  opinions that were contrary to the

| Jodie Hunter | Page 6 |

1   Department of Corrections?
2       A.   Not in court. But informally
3   throughout the Department when I'm asked to
4   review things internally, there have been
5   times where -- I don't know if it's against
6   the Department of Correction. But not
7   necessarily in favor of an officer's
8   actions.
9       Q.   Well, have you ever testified
10  in any kind of a legal case against the
11  Department?
12      A.   I have not.
13      Q.   And you wouldn't do that,
14  would you?
15      A.   If the situation arose, I'm
16  not going to jeopardize my reputation and
17  lie.
18      Q.   I know.
19           But would you accept money to
20  testify against the Department?
21      A.   That is not something that I
22  would -- I didn't accept money for this. I
23  can't say -- without an exact situation -- I
24  haven't been in that situation and --

| Jodie Hunter | Page 7 |

1       Q.   Okay. So today what you're
2   doing is part of your ordinary job duties?
3       A.   Kind of an additional
4   assignment because of my experience in use
5   of force.
6       Q.   You're getting paid your
7   regular salary for being here today?
8       A.   I am getting paid my regular
9   salary, yes.
10      Q.   So you are being paid by the
11  Department to sit here today and answer
12  questions?
13      A.   That's correct.
14      Q.   A little background.
15           What is your educational
16  background? Well, first of all, let's start
17  with: What year did you graduate high
18  school?
19      A.   I graduated high school in
20  1993.
21      Q.   Since 1993, can you tell me
22  what formal education you've had that
23  resulted in some type of a degree or a
24  diploma?

| Jodie Hunter | Page 8 |

1       A.   Yes. I graduated from
2   West Chester University in Pennsylvania in
3   1997 with a bachelor's degree majoring in
4   criminal justice and minoring in sociology.
5       Q.   All right. Any others?
6       A.   No.
7       Q.   Any other degrees?
8       A.   Not a degree, no, sir.
9       Q.   Okay. And you started with
10  the Department of Corrections in what year?
11      A.   I started as an intern when I
12  was in college in 1996.
13      Q.   And when did you start as an
14  actual employee?
15      A.   As an employee, in 1997 as a
16  casual/seasonal employee. But part time
17  with the Department.
18      Q.   What was your first position
19  when you started?
20      A.   So the position was called --
21  it was casual/seasonal. It was called
22  Miscellaneous Investigator. It was out of
23  the Plummer Community Correctional Center in
24  Wilmington working with a probation and

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

---

Jodie Hunter                                                    Page 9

1   parole unit that was assigned to that work
2   release facility.
3       Q.    All right. And at some point
4   you went from casual/seasonal to a full-time
5   employee. Is that correct?
6       A.    Yes, that's correct.
7       Q.    When did that happen?
8       A.    That was in April of 1998.
9       Q.    And when you became a
10  full-time employee, what was your job
11  position?
12      A.    My position was Probation and
13  Parole Officer I.
14      Q.    And how long did you keep that
15  position?
16      A.    So I continued to be a
17  probation and parole officer, rising through
18  various ranks, up through Probation and
19  Parole Officer II and Senior Probation
20  Officer, up until September of 2010 when I
21  transferred to the Training Academy as an
22  instructor.
23      Q.    When you transferred to the
24  Training Academy, did you have to apply for

---

Jodie Hunter                                                   Page 10

1   that position?
2       A.    Yes, I did.
3       Q.    And did you interview for that
4   position?
5       A.    Yes.
6       Q.    And who interviewed you?
7       A.    I'm trying to remember who. I
8   believe the existing training director at
9   the time -- I believe I had two interviews.
10  The -- Kathy Mickle-Askin was the training
11  director at the time. I believe she was in
12  on one of them. I believe Ron Sauls may
13  have been on -- I can't say with 100 percent
14  certainty. It's been a while, so...
15      Q.    Did you interview at all with
16  the Commissioner or anybody from the
17  Commissioner's office?
18      A.    Not the Commissioner directly.
19  But I believe that Karl Hines was on my
20  second interview, if I remember correctly.
21  And I cannot remember what position he
22  actually held in that here. But he did move
23  up through the higher ranks of the
24  Department. I can't remember what position

---

Jodie Hunter                                                   Page 11

1   he held at that time.
2       Q.    Do you know who had the final
3   say if you were hired?
4       A.    So I can't say specifically,
5   because I wasn't privy to that at the time.
6   I can speak generally within the
7   departmental operations. But I can't say at
8   that time. I wouldn't have been privy to
9   that. I had just been offered.
10      Q.    Well, you understand that you
11  ultimately served at the pleasure of the
12  Commissioner?
13      A.    I'm a merit employee, sir. So
14  the Commissioner doesn't typically have
15  involvement in hiring of those --
16      Q.    Okay.
17      A.    -- those positions, no.
18      Q.    You said you are a merit
19  employee?
20      A.    I am, yes.
21      Q.    Who is your boss now?
22      A.    Currently, it is Louise
23  Layton. She's the Deputy Warden of the
24  Special Operations Group.

---

Jodie Hunter                                                   Page 12

1       Q.    And at this point, at this
2   time in your career, what are your duties?
3       A.    So now I basically oversee
4   training for the Department of Correction.
5   We handle -- here at the Training Academy we
6   handle training for all incoming
7   correctional officers and probation and
8   parole officers, as well as our nonsworn
9   staff who work in Level IV and Level V
10  facilities or work release and prison
11  institutions. So positions that work
12  directly with inmates -- counselors,
13  teachers, and stuff like that. So I oversee
14  training for those programs -- the basic
15  training programs -- as well as our annual
16  refresher training for the Department for
17  all staff within the Department, responsible
18  for looking for and bringing in professional
19  development opportunities for staff. I
20  approve lesson plans, supervise our
21  employees in the unit, responsible for
22  hiring in the unit.
23          That's kind of a snapshot.
24      Q.    Well, I would just say from

---

Jodie Hunter     Page 13

1  listening to you it sounds like you have
2  quite a few duties.
3      **A.   I do, yes.**
4      Q.   But mostly it's supervision.
5  Is that correct at this point?
6      **A.   So my, like, direct**
7  **supervision of employees is -- there's**
8  **another level below, like, that reports to**
9  **me. And they are more the direct supervisor**
10 **of the instructors, kind of like more big**
11 **picture. But, yes, I do have some direct**
12 **supervision.**
13     Q.   But most of your interaction
14 is with other teachers or supervisors or
15 people who would actually give instruction.
16 Is that fair to say?
17     **A.   Yes.**
18     Q.   You're not running classes
19 yourself?
20     **A.   That's correct. I do on**
21 **occasion teach some of the -- like a**
22 **leadership class and some things like that.**
23 **But not -- but it's not my daily activity.**
24 **You're right.**

Jodie Hunter     Page 14

1      Q.   You're not at this point
2  training the -- I don't know if you call
3  them "cadets" or what you call them at the
4  Academy. You're not training at the
5  Academy. Is that correct?
6      **A.   That's correct.**
7      Q.   Did you do that at some point
8  in your career?
9      **A.   Yes, I did.**
10     Q.   And how long ago was that?
11     **A.   So that was from 2010 when I**
12 **first came to the Training Academy until**
13 **approximately 2018. So 2018 is when I began**
14 **promoting into the administration ranks. I**
15 **did continue with some of that training**
16 **initially. So I'd say probably through the**
17 **end of 2018.**
18     Q.   Did your training involve the
19 training in use of force? Training officers
20 in the use of force?
21     **A.   Yes.**
22     Q.   And training them in using the
23 PepperBall launcher?
24     **A.   I am not a certified**

Jodie Hunter     Page 15

1  **instructor in PepperBall launcher.**
2      Q.   All right. So you have never
3  used it or seen it used. Is that correct?
4      **A.   That is correct. Our CERT**
5  **team members -- Correctional Emergency**
6  **Response Team members train that.**
7      Q.   Okay. I'm going to ask you
8  some things about your report. And if you
9  have it there, you can take a look at it if
10 I ask you anything that requires you to do
11 that.
12     **A.   Sure.**
13     Q.   And I'm going to start really
14 on -- there's no page number here on what I
15 have. But it looks like the second page --
16     **A.   Okay.**
17     Q.   -- where it talks about you
18 believe that the defendant officers
19 exhausted all reasonable alternatives before
20 using force.
21     Is that your opinion?
22     **A.   Yes.**
23     Q.   Does that include whether or
24 not they asked Mental Health to come and

Jodie Hunter     Page 16

1  talk to the offender?
2      **A.   I'm not sure what you mean by**
3  **that.**
4      Q.   Well, I mean, they could have
5  had somebody from Mental Health come and
6  talk to this man prior to bringing in the
7  QRT or having them fire into the cell.
8  Correct?
9      **A.   That's not a standard**
10 **practice. He was not housed in a mental**
11 **health unit. And that's -- and with the**
12 **fact that dangerous contraband was found,**
13 **it's not typical to introduce a nonsecurity**
14 **staff member into a situation like that.**
15     Q.   Well, if you bring in somebody
16 from Mental Health, they would speak to him
17 from outside the cell. There would be no
18 danger to them, would there?
19     **A.   Well, depending on -- not in**
20 **that exact instance. But it's not something**
21 **that is a common practice. And there were**
22 **several people that had a conversation with**
23 **him prior.**
24     Q.   Well, the officer said that

    **PA013**     Basye Santiago Reporting    

Jodie Hunter                                                    Page 21

1  extremely reasonable option.  And
2  specifically because the defendant -- excuse
3  me -- Mr. Cropper had done several things,
4  such as spraying water all over himself.
5  And that creates a hazard for the responding
6  officers, as well as him, while they're
7  trying to take him into custody.
8           And so with an OC aerosol
9  canister, especially with the layers he had
10  and a blanket in front of him, the effect --
11  the likelihood of that being effective given
12  the whole situation was less likely.  The
13  PepperBall gives a lot more options even
14  within it, the use of the PepperBall itself.
15      Q.    Was using the pepper canister
16  a reasonable alternative or not?
17      A.    It is an alternative.  Would
18  it be reasonable?  It's certainly within
19  policy within the use of force model.
20  Again, given the totality of the
21  circumstances, could they have used it?
22  Maybe.  They could have.  By policy could
23  have.  Would it have been effective?  Given
24  all of those factors that were taking place,

Jodie Hunter                                                    Page 22

1  the officer's choice to use the PepperBall
2  launcher was reasonable and, I believe, more
3  appropriate than just spraying OC aerosol
4  first.
5      Q.    Suppose you had the option to
6  use the aerosol but you didn't really
7  believe it would work.  Would it be
8  appropriate to go ahead and use it if you
9  didn't think it would work?
10      A.    I guess that's a general
11  statement.  So, I mean, it depends on why.
12  I'm not sure what -- that sounds like a
13  general --
14      Q.    Well, let me repeat the
15  question.
16           (The audio portion of the Zoom
17  dropped at this point.)
18           (The reporter requested the
19  witness repeat her answer.)
20           (A brief discussion was held
21  off the record.)
22  BY MR. HAMPTON:
23      Q.    Okay.  Ms. Hunter, the
24  question I was going to ask, I believe, is

Jodie Hunter                                                    Page 23

1  that if you recall when you read Officer or
2  now Lieutenant Mock's deposition when I
3  asked him if he thought that the inmate,
4  Mr. Cropper, was going to cooperate and he
5  admitted that he did not believe he was
6  going to cooperate with being cuffed up.  Do
7  you recall reading that?
8      A.    I would have to look back at
9  the -- his deposition for that.  Would you
10  like me to do that?
11      Q.    Well, let's assume for the
12  moment that he did say that.  And he also
13  admitted that he did not believe that the
14  PepperBalls were going to work.
15      A.    Right.
16      Q.    If that was his thought, was
17  it appropriate to go ahead with PepperBalls
18  if he didn't believe they were going to
19  work?
20      A.    Well, again, you're -- we're
21  trying to use the least amount of force
22  necessary and also to protect our officers
23  in the process.  And so, yes, we're going to
24  take steps to try to get that person under

Jodie Hunter                                                    Page 24

1  control.  And if we can do that while
2  maintaining distance, which is the whole
3  purpose of using a PepperBall launcher --
4  you know, we don't know how a person is
5  going to act.  Sometimes we think they may
6  comply right away and they surprise us and
7  put up a large fight.  And sometimes vice
8  versa.  So the options are there.  He can't
9  certainly go right to deadly force because
10  he doesn't think that some of the others --
11  he still had to put in a reasonable effort
12  to get that person under control with lesser
13  force.
14      Q.    Well, he didn't believe
15  PepperBalls were going to work.  And they
16  didn't.  Correct?
17      A.    No.
18      Q.    So they send in the QRT to pin
19  Mr. Cropper against the bunk and then
20  ultimately cuffed him and took him out of
21  the cell.  Right?
22      A.    Right.  That didn't initially
23  work either.
24      Q.    They took him out of the cell.

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

Jodie Hunter                                        Page 25

1  And they didn't injure him. What injured
2  him was getting shot in the eye by a
3  PepperBall. Correct?
4      A.    Yeah. It does seem to be that
5  that's what -- where the injury came from.
6      Q.    So going into the cell and
7  pinning him down and cuffing him, even if it
8  means you spray him in the face with pepper
9  spray, it's not going to put his eye out, is
10 it?
11     A.    People can have effects of OC
12 spray.
13     Q.    I asked --
14     A.    And also in a QRT situation,
15 absolutely, especially where somebody puts
16 up a fight. It may not be necessarily
17 putting out an eye. But people can sustain
18 a severe head injury. There are all kinds
19 of injuries that are unintended and yet
20 unfortunate, whatever force has to be used.
21     Q.    All right. Are you aware of
22 any incident in the QRT where anyone other
23 than Mr. Cropper had to be taken to a
24 hospital because of injury sustained in a

Jodie Hunter                                        Page 26

1  QRT?
2      A.    In the Department of
3  Correction or --
4      Q.    Yes.
5      A.    -- in general?
6            Yes.
7      Q.    And when they're taking
8  somebody out of a cell -- cell extraction --
9  are you aware of anybody else that had to go
10 to the hospital after cell extraction
11 because of injuries sustained in the cell
12 extraction other than Mr. Cropper?
13     A.    Yes. I am aware of at least
14 two incidents that -- yes.
15     Q.    Did they have permanent
16 injury?
17     A.    Yes.
18     Q.    Okay. Anybody lose an eye?
19     A.    The two that I am referring to
20 that I know are -- they resulted in death.
21     Q.    One of them was Mr. Shoup?
22     A.    I believe it was -- if he was
23 the one from Sussex, I'm not -- the names
24 off the top on my head --

Jodie Hunter                                        Page 27

1      Q.    Yeah.
2      A.    I believe he may have been the
3  person from Sussex County, yes.
4      Q.    He was the one from Sussex,
5  yeah.
6      A.    Yes.
7      Q.    And they crushed his chest by
8  laying on top of him. Correct?
9      A.    I can't say.
10           MS. SONG: I'm just going to
11 object to the line of questioning. I
12 don't want Ms. Hunter to go into the
13 facts of a situation that's not related
14 to this QRT extraction.
15           MR. HAMPTON: I'll move on.
16           MS. SONG: I don't know if
17 there's open litigation in that case, but
18 I don't want there to be any --
19           MR. HAMPTON: I'll move on
20 from that.
21           MS. SONG: Thank you.
22 BY MR. HAMPTON:
23     Q.    In deposing Lieutenant Mock,
24 he said that it had been about four months

Jodie Hunter                                        Page 28

1  prior that he had received his training with
2  a PepperBall launcher. Does that ring a
3  bell with you?
4      A.    Yeah. I remember that it was
5  fairly recently.
6      Q.    And in that four months, he
7  had taken the PepperBall launcher to a
8  number of QRT cell extractions but had never
9  used it.
10     A.    Yes, sir.
11     Q.    Do you recall reading that?
12     A.    Yes.
13     Q.    And, in fact, when we asked
14 the other correctional officers that we
15 deposed, none of them ever really remember
16 being in a QRT situation where PepperBalls
17 were actually launched at the inmate with
18 the exception that maybe Megan McCarthy
19 thought she may have seen it.
20     A.    Yes.
21     Q.    But it's really, really rare,
22 isn't it?
23     A.    I can't speak to how common it
24 is. I haven't been given other cases to

PA015

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

Jodie Hunter                                      Page 25

1    And they didn't injure him. What injured
2    him was getting shot in the eye by a
3    PepperBall. Correct?
4        A.    Yeah. It does seem to be that
5    that's what -- where the injury came from.
6        Q.    So going into the cell and
7    pinning him down and cuffing him, even if it
8    means you spray him in the face with pepper
9    spray, it's not going to put his eye out, is
10   it?
11       A.    People can have effects of OC
12   spray.
13       Q.    I asked --
14       A.    And also in a QRT situation,
15   absolutely, especially where somebody puts
16   up a fight. It may not be necessarily
17   putting out an eye. But people can sustain
18   a severe head injury. There are all kinds
19   of injuries that are unintended and yet
20   unfortunate, whatever force has to be used.
21       Q.    All right. Are you aware of
22   any incident in the QRT where anyone other
23   than Mr. Cropper had to be taken to a
24   hospital because of injury sustained in a

Jodie Hunter                                      Page 26

1    QRT?
2        A.    In the Department of
3    Correction or --
4        Q.    Yes.
5        A.    -- in general?
6              Yes.
7        Q.    And when they're taking
8    somebody out of a cell -- cell extraction --
9    are you aware of anybody else that had to go
10   to the hospital after cell extraction
11   because of injuries sustained in the cell
12   extraction other than Mr. Cropper?
13       A.    Yes. I am aware of at least
14   two incidents that -- yes.
15       Q.    Did they have permanent
16   injury?
17       A.    Yes.
18       Q.    Okay. Anybody lose an eye?
19       A.    The two that I am referring to
20   that I know are -- they resulted in death.
21       Q.    One of them was Mr. Shoup?
22       A.    I believe it was -- if he was
23   the one from Sussex, I'm not -- the names
24   off the top on my head --

Jodie Hunter                                      Page 27

1        Q.    Yeah.
2        A.    I believe he may have been the
3    person from Sussex County, yes.
4        Q.    He was the one from Sussex,
5    yeah.
6        A.    Yes.
7        Q.    And they crushed his chest by
8    laying on top of him. Correct?
9        A.    I can't say.
10             MS. SONG: I'm just going to
11   object to the line of questioning. I
12   don't want Ms. Hunter to go into the
13   facts of a situation that's not related
14   to this QRT extraction.
15             MR. HAMPTON: I'll move on.
16             MS. SONG: I don't know if
17   there's open litigation in that case, but
18   I don't want there to be any --
19             MR. HAMPTON: I'll move on
20   from that.
21             MS. SONG: Thank you.
22   BY MR. HAMPTON:
23       Q.    In deposing Lieutenant Mock,
24   he said that it had been about four months

Jodie Hunter                                      Page 28

1    prior that he had received his training with
2    a PepperBall launcher. Does that ring a
3    bell with you?
4        A.    Yeah. I remember that it was
5    fairly recently.
6        Q.    And in that four months, he
7    had taken the PepperBall launcher to a
8    number of QRT cell extractions but had never
9    used it.
10       A.    Yes, sir.
11       Q.    Do you recall reading that?
12       A.    Yes.
13       Q.    And, in fact, when we asked
14   the other correctional officers that we
15   deposed, none of them ever really remember
16   being in a QRT situation where PepperBalls
17   were actually launched at the inmate with
18   the exception that maybe Megan McCarthy
19   thought she may have seen it.
20       A.    Yes.
21       Q.    But it's really, really rare,
22   isn't it?
23       A.    I can't speak to how common it
24   is. I haven't been given other cases to

Jodie Hunter            Page 81

1   middle of an uncertain, rapidly evolving
2   event, your brain can only process so fast.
3   And your brain is operating. It has to send
4   a message to your trigger finger to pull
5   that trigger. And what your intention is is
6   one thing. And by the time it all plays
7   out -- and Mr. Cropper moves again in a
8   noncompliant way, I -- again, I see that as
9   he -- his use of the tool is based on, you
10   know, his point of aim.
11     Q.   Well, isn't it pretty obvious
12   that he did not take into account the
13   inmate's actions when he was moving around?
14     A.   I don't think that at all. I
15   think he clearly states why he did what he
16   did. And he was -- he was taking the
17   inmate's actions into account. He started
18   by, again, first of all, just a show of
19   force, then attempting a psychological
20   deterrence by shooting into the blanket,
21   which would cause no injury or impact even.
22   And then he attempts an area of saturation
23   and a combination of area of saturation and
24   the direct impact, which is exactly how that

Jodie Hunter            Page 82

1   piece of equipment is intended to be used.
2     Q.   Let me just ask a few more
3   quotes with the lieutenant.
4     "Would it be fair to say that
5   when you were shooting the PepperBalls you
6   were shooting them close enough to Cropper
7   that if he moved or lunged he was going to
8   get hit in the face?"
9     ANSWER: "That was always a
10   concern. When deploying a PepperBall, that
11   could always in every single situation be a
12   concern."
13     ANSWER (sic): "What steps did
14   you take to try to make sure it didn't
15   happen?"
16     "I didn't aim at his face."
17     "If you can foresee that if
18   he's moving or lunging around that he might
19   get hit in the face, is it really enough
20   just to say, 'I didn't aim at his face'?"
21     I mean, that's the point. If
22   he's lunging and moving around and you're
23   shooting anywhere near his head, you don't
24   have to aim directly at his face to hit him

Jodie Hunter            Page 83

1   in the face. Correct?
2     A.   I feel like we discussed this.
3   If he's not aiming -- like he said, I
4   have -- I would totally agree with what his
5   statement is. If he's not aiming at his
6   face -- the PepperBall launcher is designed
7   to be deployed and fired at -- directly at a
8   person. So he's doing exactly what he was
9   trained to do. He was firing it -- one of
10   the ways he chose to use it was to fire it
11   directly at Mr. Cropper.
12     Q.   If somebody is moving around
13   and lunging and bobbing and weaving or
14   whatever, how do you not aim at his face
15   because he's moving?
16     A.   You aim at other parts of his
17   body.
18     Q.   Well, you aim it so it's not
19   near his face. Correct?
20     A.   Yes. At other parts of the
21   body but --
22     Q.   You would aim it so it's not
23   near his face. Correct?
24     A.   When you're aiming it and you

Jodie Hunter            Page 84

1   pull the trigger and fire and he moves,
2   unfortunately, a different body part that
3   was intended could move into. I'm sure that
4   probably -- maybe he was aiming for his leg
5   at one point. Or lower leg and got hit in
6   the upper leg or vice versa. Or maybe he
7   was trying to shoot him in the torso and
8   actually hit him in the arm. I mean, this
9   is -- that's the nature of firing at a
10   moving target, which is exactly what the
11   PepperBall luncher is intended for.
12     Q.   It's completely foreseeable,
13   isn't it, if you're shooting at a moving
14   target that if you're not careful to aim low
15   so that you can't hit him in the head -- if
16   you're shooting at a moving target shooting
17   anywhere near the face that you could hit
18   him in the face. Isn't that foreseeable?
19     A.   Again, I think it's
20   foreseeable that you could get hit in the
21   face. Depending on where you're aiming, if
22   you're moving around it, you --
23     Q.   It's foreseeable.
24     A.   Anything is foreseeable.

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

Jodie Hunter                                          Page 85

1    Q.    It is. Right?
2    A.    Anything is -- you are
3    aiming -- if you don't know where a person
4    is going to move -- he is doing his due
5    diligence by firing and aiming at areas that
6    are approved areas to deploy. We cannot
7    predict what the subject is going to do and
8    where specifically he's going to move.
9          He was also pulling a blanket
10   up and down and up and down and around and
11   moving around. So it certainly makes it
12   difficult. And if he had fired it into the
13   blanket, it wouldn't even have touched him
14   at all. So this -- we're -- we keep coming
15   back to this. But I don't feel like there
16   was anything that was negligent or that was
17   done maliciously or sadistically. He was
18   using the tool as intended as in trained --
19   as he was trained within policy. And there
20   was a subject who was very dangerous, who
21   was charging at him multiple times, charged
22   at him in the cell.
23   Q.    Really? Charging multiple
24   times?

Jodie Hunter                                          Page 86

1    A.    Well, he charged at least
2    once. I believe there were at least --
3    there were two times where he came up and he
4    was puffing his chest up at them. Yes.
5    Q.    Okay. So you're describing a
6    situation where he's moving around, putting
7    the blanket up and down. You don't know
8    where he's going to be any moment. For
9    goodness sake, is it safe to be shooting
10   PepperBalls at him when you don't know where
11   his face is going to be?
12   A.    Yes, sir.
13   Q.    Is it safe?
14   A.    Yes.
15   Q.    It wasn't safe. He shot him
16   in the eye and put his eye out. How is it
17   safe?
18   A.    It's an unfortunate injury
19   that occurred, sir.
20   Q.    Well, it would be really easy
21   not for it to occur if you don't shoot near
22   him when he's moving around. Isn't that
23   really what you should be instructing
24   people? If they're moving all around and

Jodie Hunter                                          Page 87

1    you don't know where they're going to be,
2    don't shoot the PepperBall. How could it be
3    any simpler than that?
4          I mean, if you're shooting at
5    him with something that could put his eye
6    out and you don't know where he's going to
7    be -- you're shooting at the wall. But he
8    could be there because he's moving around.
9    How is that acceptable?
10   A.    Was that a question?
11   Q.    Yes.
12         How is that acceptable?
13   A.    Sir, it's a use of force tool.
14   Again, there are -- this is for a subject
15   who is repeatedly choosing not to cooperate
16   and to follow instructions and commands.
17   And the officers are trying to get him under
18   control. They're trying to do that with
19   minimal risk of injury to both the inmate
20   and the officers who are having to respond
21   and get him under control. I don't see
22   anything that would --
23   Q.    How is this minimizing the
24   risk of injury to the inmate when you're

Jodie Hunter                                          Page 88

1    shooting -- and he's moving around and
2    you're shooting PepperBalls and he's
3    moving -- you're moving -- shooting near him
4    and he's moving around? How is that
5    minimizing risk to the inmate?
6    A.    Well, I don't know exactly how
7    many PepperBalls were fired, but there were
8    a lot of PepperBalls fired in that incident.
9    And it seems as only one caused injury. So
10   with the vast majority, I mean, it's
11   designed -- it's an instrument that's
12   designed to alleviate potential injury. The
13   actual impact from the PepperBalls is very,
14   very minimal. It's significantly less than
15   the impact rounds that are less lethal. It
16   is a less lethal weapon.
17   Q.    All right. Is it less lethal
18   than the canister of pepper spray?
19   A.    It's -- they are really along
20   the same lines, sir. It's not that one is
21   more or less. They're both less lethal
22   options. They have different effects. It's
23   like comparing apples to oranges.
24   Q.    Well, let's think about it

Jodie Hunter                                    Page 81

1    middle of an uncertain, rapidly evolving
2    event, your brain can only process so fast.
3    And your brain is operating. It has to send
4    a message to your trigger finger to pull
5    that trigger. And what your intention is is
6    one thing. And by the time it all plays
7    out -- and Mr. Cropper moves again in a
8    noncompliant way, I -- again, I see that as
9    he -- his use of the tool is based on, you
10   know, his point of aim.
11        Q.    Well, isn't it pretty obvious
12   that he did not take into account the
13   inmate's actions when he was moving around?
14        A.    I don't think that at all. I
15   think he clearly states why he did what he
16   did. And he was -- he was taking the
17   inmate's actions into account. He started
18   by, again, first of all, just a show of
19   force, then attempting a psychological
20   deterrence by shooting into the blanket,
21   which would cause no injury or impact even.
22   And then he attempts an area of saturation
23   and a combination of area of saturation and
24   the direct impact, which is exactly how that

Jodie Hunter                                    Page 82

1    piece of equipment is intended to be used.
2        Q.    Let me just ask a few more
3    quotes with the lieutenant.
4              "Would it be fair to say that
5    when you were shooting the PepperBalls you
6    were shooting them close enough to Cropper
7    that if he moved or lunged he was going to
8    get hit in the face?"
9              ANSWER: "That was always a
10   concern. When deploying a PepperBall, that
11   could always in every single situation be a
12   concern."
13             ANSWER (sic): "What steps did
14   you take to try to make sure it didn't
15   happen?"
16             "I didn't aim at his face."
17             "If you can foresee that if
18   he's moving or lunging around that he might
19   get hit in the face, is it really enough
20   just to say, 'I didn't aim at his face'?"
21             I mean, that's the point. If
22   he's lunging and moving around and you're
23   shooting anywhere near his head, you don't
24   have to aim directly at his face to hit him

Jodie Hunter                                    Page 83

1    in the face. Correct?
2        A.    I feel like we discussed this.
3    If he's not aiming -- like he said, I
4    have -- I would totally agree with what his
5    statement is. If he's not aiming at his
6    face -- the PepperBall launcher is designed
7    to be deployed and fired at -- directly at a
8    person. So he's doing exactly what he was
9    trained to do. He was firing it -- one of
10   the ways he chose to use it was to fire it
11   directly at Mr. Cropper.
12        Q.    If somebody is moving around
13   and lunging and bobbing and weaving or
14   whatever, how do you not aim at his face
15   because he's moving?
16        A.    You aim at other parts of his
17   body.
18        Q.    Well, you aim it so it's not
19   near his face. Correct?
20        A.    Yes. At other parts of the
21   body but --
22        Q.    You would aim it so it's not
23   near his face. Correct?
24        A.    When you're aiming it and you

Jodie Hunter                                    Page 84

1    pull the trigger and fire and he moves,
2    unfortunately, a different body part that
3    was intended could move into. I'm sure that
4    probably -- maybe he was aiming for his leg
5    at one point. Or lower leg and got hit in
6    the upper leg or vice versa. Or maybe he
7    was trying to shoot him in the torso and
8    actually hit him in the arm. I mean, this
9    is -- that's the nature of firing at a
10   moving target, which is exactly what the
11   PepperBall luncher is intended for.
12        Q.    It's completely foreseeable,
13   isn't it, if you're shooting at a moving
14   target that if you're not careful to aim low
15   so that you can't hit him in the head -- if
16   you're shooting at a moving target shooting
17   anywhere near the face that you could hit
18   him in the face. Isn't that foreseeable?
19        A.    Again, I think it's
20   foreseeable that you could get hit in the
21   face. Depending on where you're aiming, if
22   you're moving around it, you --
23        Q.    It's foreseeable.
24        A.    Anything is foreseeable.

Cropper v.
McCarthy

Jodie Hunter
August 15, 2018

Jodie Hunter                                                    Page 109

1    whether you thought the use of force applied
2    was reasonable?
3        A.    Yeah.  I believe -- from the
4    very beginning till the end, I think
5    their -- the officers demonstrated
6    professionalism.  They acted within policy.
7    Their actions and their choice to use force
8    after several steps to try to de-escalate
9    Mr. Cropper were all reasonable.
10           When they did use force, the
11   force they chose was reasonable under the
12   circumstances.  Even when he continued to
13   be, you know, aggressive and uncooperative,
14   they still -- even when they had him -- when
15   the team had gone in, they could have
16   delivered strikes.  They could have
17   delivered stuns to him to try to get him to
18   loosen his arms up to try to get him under
19   control.  They didn't.  They simply applied
20   a little bit of OC spray.  And they were
21   finally able to get him under control.
22           As soon as he was under
23   control, they stopped the use of all force
24   and did what they were required to do, which

Jodie Hunter                                                    Page 110

1    was start to render medical aid to him.  You
2    know, they got him to Medical.  They were
3    professional with him the entire time.
4           To me, it seems like a
5    textbook case.  And it's very unfortunate,
6    as I said earlier, that sometimes, even when
7    we do everything right -- sometimes an
8    injury may be sustained.  Sometimes an
9    injury is to an inmate.  Sometimes it's to
10   an officer.  But they were absolutely within
11   policy.  They acted within the Use of Force
12   Model.  And, then, their actions were
13   reasonable, given the circumstances.
14   Mr. Cropper was a very difficult person to
15   try to get under control.
16           MS. SONG:  Okay.  Thank you.
17   I don't have any other
18   questions for Ms. Hunter.
19           MR. HAMPTON:  Yeah.  I have a
20   few more.
21   BY MR. HAMPTON:
22       Q.    The use of force policy, just
23   a couple things about it since it was
24   mentioned there.  And I think you would

Jodie Hunter                                                    Page 111

1    agree that in that policy -- oh.
2           MR. HAMPTON:  And, by the way,
3    you can take that down, if you want,
4    Rebecca, the -- okay.  Thank you.
5    BY MR. HAMPTON:
6        Q.    In the use of force policy, it
7    says, "The use of force must be reasonable
8    under the circumstances."  So I'm taking
9    from that that you would say that, when
10   Sergeant Mock was shooting PepperBalls in
11   the area of Mr. Cropper in an area that
12   could strike him in the eye, if he moved
13   that that was reasonable under the
14   circumstances.
15       A.    His choice to use the
16   PepperBall, yes, was absolutely reasonable
17   under those circumstances.
18       Q.    And the fact that it was close
19   enough that if he moved he could get hit in
20   the eye was still reasonable?
21       A.    Yes, sir.  His use of the
22   PepperBall throughout that incident was
23   reasonable.
24       Q.    All right.  Now, you were

Jodie Hunter                                                    Page 112

1    talking about mental health.  At the bottom
2    of that page of the policy, 5, it says, "If
3    possible, staff should consider the age,
4    gender, health and mental status prior to
5    the use of force."  Do you have any evidence
6    that they considered the mental status of
7    Mr. Cropper prior to using force?
8        A.    Well, it also says "if known."
9    So the entire sentence says "if possible"
10   and "if known" that they should take those
11   things into consideration.
12           There is -- you know, if they
13   took steps -- reasonable steps to
14   de-escalate that situation.  And there was
15   no documented history.  Nobody mentioned
16   anything, even Mr. Cropper in his own
17   deposition, about any kind of mental health
18   condition that anybody knew about at the
19   time.
20       Q.    Well, were you aware that
21   Sergeant Mock knew that he had multiple
22   mental health interactions in the past?  In
23   fact, Sergeant Mock said that he thought he
24   was manipulating mental health because he

Cropper v McCarthy, et al.                                                                6/22/2021 Depo of Robert Mock

**17**

| | | |
|---|---|---|
| 10:17:05 | 1 | everybody? |
| 10:17:05 | 2 | A.   Yes, sir. |
| 12:17:09 | 3 | Q.   Let's see here.  Now, I'm going to ask you |
| 10:17:13 | 4 | to look at paragraph V where it says policy. |
| | 5 | A.   Okay.  Yes. |
| 10:17:17 | 6 | Q.   Do you see that? |
| 10:17:17 | 7 | A.   Yes. |
| 10:17:18 | 8 | Q.   The second paragraph? |
| 10:17:19 | 9 | A.   Yes. |
| 10:17:20 | 10 | Q.   The use of force? |
| 10:17:21 | 11 | A.   Yes. |
| 10:17:22 | 12 | Q.   The use of force must be reasonable under |
| 10:17:27 | 13 | the circumstances and should be used only when no other |
| 10:17:30 | 14 | reasonable alternative is available.  If possible, staff |
| 10:17:35 | 15 | shall take reasonable steps to de-escalate a situation |
| 10:17:38 | 16 | or otherwise prevent the need to use of force.  The use |
| 10:17:43 | 17 | of force may not be used as a retaliatory or |
| 10:17:47 | 18 | disciplinary measure. |
| 10:17:48 | 19 | A.   Yes, sir. |
| 10:17:50 | 20 | Q.   Has that always been part of the training |
| 10:17:52 | 21 | that you've gotten for use of force? |
| 10:17:54 | 22 | A.   Yes, sir. |
| 10:18:00 | 23 | Q.   At the bottom of that page, it says:  If |
| 10:18:02 | 24 | possible, staff should consider the age, gender, health, |

Cheryl A. Anthony, LLC
(302) 674-8884

**18**

| | | |
|---|---|---|
| 10:18:06 | 1 | and mental status prior to the use of the force. |
| 10:18:10 | 2 | Is that how you've always been trained? |
| 10:18:12 | 3 | A.   Yes. |
| 10:18:13 | 4 | Q.   All right.  I'm going to take that down. |
| 10:18:36 | 5 | A.   Okay. |
| 10:18:37 | 6 | Q.   All right.  We're back, right? |
| 10:18:42 | 7 | A.   Perfect, yes. |
| 10:18:44 | 8 | Q.   Now, in your interaction with Mr. Cropper on |
| 10:18:49 | 9 | the day that he had his eye injured, did you consider |
| 10:18:56 | 10 | alternate uses of force other than a pepperball launcher |
| 10:19:03 | 11 | when you interacted with him? |
| 10:19:05 | 12 | A.   Yes, sir. |
| 10:19:06 | 13 | Q.   What else did you consider? |
| 10:19:08 | 14 | A.   Well, so at that point it's really just a -- |
| 10:19:13 | 15 | it's a safety thing.  Mr. Cropper had demonstrated. |
| 10:19:15 | 16 | Through the noncompliance, he was given |
| 10:19:21 | 17 | multiple opportunities verbally to comply.  He was given |
| 10:19:24 | 18 | many, many explanations as to what was occurring and |
| 10:19:28 | 19 | why. |
| 10:19:28 | 20 | He made the decision to cover his cell floor |
| 10:19:32 | 21 | in water, which then puts any type of physical force -- |
| 10:19:40 | 22 | the boots we use and prior experience, it puts the |
| 10:19:43 | 23 | officers in danger as soon as they step in there.  And |
| 10:19:46 | 24 | the inmate either doesn't have shoes on or has their |

Cheryl A. Anthony, LLC
(302) 674-8884

**19**

| | | |
|---|---|---|
| 10:19:53 | 1 | state-issued shoes on compared to our state-issued |
| 10:19:54 | 2 | boots, which slip on the floor. |
| 10:19:55 | 3 | So the alternative of physical force to |
| 10:19:57 | 4 | remove him from the cell, verbal de-escalation, social |
| 10:20:03 | 5 | presence, everything else had been considered and |
| 10:20:05 | 6 | followed.  And it just escalated to the force of the |
| 10:20:09 | 7 | pepperball launcher. |
| 10:20:10 | 8 | Q.   Was there a consideration to ask |
| 10:20:13 | 9 | intervention from mental health? |
| 10:20:15 | 10 | A.   There was, from the on-duty supervisor at |
| 10:20:19 | 11 | the time, which was the team leader, Lieutenant Wallace. |
| 10:20:21 | 12 | The issue was that at that point Inmate Cropper was what |
| 10:20:26 | 13 | we would say in the black.  His mindset wasn't there. |
| 10:20:30 | 14 | His mindset, he was all the way up here.  He was in |
| 10:20:34 | 15 | fighting mode.  He had covered the floor.  He had |
| 10:20:37 | 16 | prepared for battle.  And he had just been found with |
| 10:20:38 | 17 | dangerous contraband, the weapon that resulted in the |
| 10:20:42 | 18 | extraction from the cell to isolation at that point. |
| 10:20:48 | 19 | Q.   All right.  In what way did Lieutenant |
| 10:20:53 | 20 | Wallace consider asking mental health to get involved? |
| 10:20:57 | 21 | A.   Well, so that would be his decision at that |
| 10:21:00 | 22 | point as the team leader to discuss either with himself |
| 10:21:03 | 23 | or with the on-duty shift commander.  He made the |
| 10:21:07 | 24 | decision that the QRT was the option to go and that the |

Cheryl A. Anthony, LLC
(302) 674-8884

**20**

| | | |
|---|---|---|
| 10:21:11 | 1 | pepperball launcher would be utilized -- not utilized. |
| 10:21:15 | 2 | It would be present and there as an option. |
| 10:21:17 | 3 | Q.   Well, how do you know he considered calling |
| 10:21:20 | 4 | mental health? |
| 10:21:21 | 5 | A.   So I don't know a hundred percent.  I mean |
| 10:21:24 | 6 | that would be a question for Lieutenant Wallace.  I'm |
| 10:21:28 | 7 | speaking in what I would have done, but again, that |
| 10:21:32 | 8 | wasn't my decision at the time.  At that point the team |
| 10:21:36 | 9 | leader and the supervisor of the area decides QRT is |
| 10:21:38 | 10 | going to be activated.  The pepperball launcher is going |
| 10:21:42 | 11 | to be there, and he's going to make the decisions from |
| 10:21:45 | 12 | that point on. |
| 10:21:48 | 13 | At the point of decision-making that I step |
| 10:21:49 | 14 | in is when Lieutenant Wallace stated on the video that |
| 10:21:53 | 15 | he was noncompliant with the orders.  At that point the |
| 10:21:58 | 16 | pepperball launcher becomes the team leader and assesses |
| 10:22:00 | 17 | the situation and determines whatever needs to take |
| 10:22:04 | 18 | place. |
| 10:22:04 | 19 | Q.   Well, you used a term, in the black, I |
| 10:22:06 | 20 | believe you described it, which is a mindset which is, |
| 10:22:11 | 21 | as I understand what you're saying, somebody who is |
| 10:22:15 | 22 | highly unlikely to cooperate if they are in that |
| 10:22:18 | 23 | mindset.  Is that correct? |
| 10:22:18 | 24 | A.   Correct.  They have the tunnel vision. |

Cheryl A. Anthony, LLC
(302) 674-8884

PA021

Cropper v McCarthy, et al.                                                                    6/22/2021 Depo of Robert Mock

---

**21**

1  They're not focused or listening on anything else.

2  They have the tunnel vision, this is what's going to

3  happen. Everything else is out.

4      Q.    Well, then when you came there with the QRT,

5  you already knew he wasn't going to cooperate, didn't

6  you?

7      A.    So I mean every single situation that goes

8  from non compliance to QRT to pepperball to whatever the

9  case may be, the inmate is given ample opportunity,

10  whether it be verbal, de-escalation -- they are given

11  ample opportunity to comply with any directives that are

12  given. So even before the QRT and the video, Inmate

13  Cropper was given ample opportunity to comply.

14      Q.    Well, what I'm asking is -- Let me be more

15  clear. By the time you arrived with the QRT, didn't you

16  reasonably suspect that he was not going to cooperate?

17      A.    It's always the hope from the team, the team

18  leader, anybody on the team, that they do comply.

19  That's why they're given the opportunity. Even when we

20  come down there, we've suited up. We've gotten

21  everything ready. We've got the video going.

22          The hope is that they will comply and no

23  force has to be used. That's why they are given those

24  opportunities, because on the use of the force models,

Cheryl A. Anthony, LLC

(302) 674-8884

---

**22**

1  social presence is a level of force. So usually, it's

2  like a show of force. We bring QRT down. They see

3  five guys. They see the pepperball launcher. They see

4  canines. They see whoever is down there, and then that

5  is used as a deterrent. Sometimes -- 90 percent of the

6  time, just a guess -- that usually that works.

7      Q.    Well, somebody is in the black, like

8  Mr. Cropper, and you have experience and history with

9  Mr. Cropper. You didn't realistically believe he was

10  going to cooperate, did you?

11      A.    I don't know. I mean again, it's -- whether

12  I believed he was or not, I don't understand. The hope

13  was that he did.

14      Q.    I understand the hope. But realistically,

15  you didn't believe he was going to cuff up, did you?

16      A.    Did I think he was going to personally? No.

17      Q.    When you formed the QRT, I understand that

18  you were the leader of the QRT?

19      A.    I was not. I was the -- I was the

20  pepperball launcher operator at that point. The only

21  time that the pepperball launcher operator becomes the

22  QRT leader is when the pepperball is being utilized,

23  because at that point, if you have two people in charge,

24  I could be firing the pepperball launcher and the team

Cheryl A. Anthony, LLC

(302) 674-8884

---

**23**

1  leader could send the team in. And that's a conflict.

2      Q.    All right. So during the time that the

3  pepperball launcher is being fired or utilized, that's

4  your decision about how to do that and when to do that?

5      A.    Correct.

6      Q.    When did you first receive training for

7  using a pepperball launcher?

8      A.    I actually wrote down my dates. My first

9  training was on May 9, 2018.

10      Q.    So about four months before this incident?

11      A.    Correct.

12      Q.    And in those four months, how many times had

13  you taken the pepperball launcher to a cell as part of

14  the QRT?

15      A.    I would be speculating. So it's issued on a

16  daily basis. So when you come in and you're told you're

17  the pepperball launcher operator for the day, you would

18  draw that pepperball launcher from the armory. And that

19  would stay secured with me in my building.

20          So I mean every single code that's called in

21  the specific general area, whether it be the SHU or the

22  MHU, I would respond with the launcher. Any QRTs that

23  were activated, I would respond with the launcher and be

24  a part of that QRT.

Cheryl A. Anthony, LLC

(302) 674-8884

---

**24**

1      Q.    Well, it sounded like from -- you know,

2  we've deposed Lieutenant Wallace. In his reports it

3  sounded like he specifically contacted you, though, to

4  alert you that a QRT was being formed. Is that what

5  happened?

6      A.    Correct. So usually -- So just like the

7  pepperball, QRT gear is issued to the officers

8  throughout at the beginning of the shift. They take it

9  to their respective buildings. And then when the area

10  supervisor, who was Lieutenant Wallace at the time,

11  decides that a QRT is going to be formed, they have to

12  call whoever is assigned to whatever specific task on

13  that QRT. So he did call.

14          And I don't even think it was a call. He

15  just notified me. He was in my building at the time.

16  He had spoken to Inmate Cropper. I was not present

17  while he was speaking to him the original time. And

18  then he let me know: Hey, QRT is going to be utilized.

19  Go ahead and grab the launcher and get prepared for QRT.

20      Q.    So at any time from the time you started

21  your training with the QRT until the incident with

22  Mr. Cropper, if you were on duty and you were the

23  pepperball launcher and somebody called a QRT, you would

24  appear as part of the QRT?

Cheryl A. Anthony, LLC

(302) 674-8884

---

**PA022**

Cropper v McCarthy, et al.                                                                 6/22/2021 Depo of Robert Mock

---

65

1   that somebody used force on and not the person using
2   force?
3        A.   So that would be my understanding, that the
4   type of force should go pertaining to the inmate that it
5   was used upon.  I guess that would be open for
6   interpretation really, because I have never -- I guess
7   that would be person to person.  That's usually just how
8   I've always done it.
9        Q.   All right.  And nobody has told you to do it
10   any different?
11        A.   I have not been told otherwise.  We don't
12   get a whole lot of DACS training.
13        Q.   All right.  The next officer is Kromka,
14   Tyler Kromka.
15        A.   Yes, sir.
16        Q.   And did he have a relative working there at
17   that time?
18        A.   Yes, sir.  I believe his father is -- was a
19   captain there.
20        Q.   And were you aware that his father was the
21   one who signed off on the use of force report?
22        A.   I was not aware.  I mean at the time I was
23   probably aware that his father was the shift commander.
24   But I had forgotten until you just said it.

Cheryl A. Anthony, LLC
(302) 674-8884

---

66

1        Q.   Any question in your mind about the father
2   signing off on a use of force report when his son was
3   involved in the use of force?
4        A.   No.  I mean his son was involved with the
5   QRT, but not the chemical or the OC or the pepperball or
6   anything like that.  It was just QRT at that point.  But
7   I mean in reference to that decision for someone's son
8   to be able to work under them as a subordinate is a
9   decision made for or a decision made against is well
10   above me.
11        Q.   All right.  I'm going to look down on
12   Kromka's report and just pick up the part where the QRT
13   team was ordered to go in.
14        A.   Okay.
15        Q.   So the QRT team was then ordered, I'm sure,
16   to go into the cell and extract Inmate Cropper from the
17   cell.  Once in the cell, Inmate Cropper jumped on the
18   bed and then I, Officer Kromka, grabbed Inmate Cropper's
19   legs and was able to get him on the ground with the
20   assistance from the other members of the QRT, went on
21   the ground.  Inmate Cropper was holding both of his arms
22   underneath his chest and was refusing to give me his
23   hands in order to cuff him.
24             Now, all of that could have happened without

Cheryl A. Anthony, LLC
(302) 674-8884

PA023

---

67

1   using pepperball at all, couldn't it?
2        A.   Yes, sir.  So again, like I referenced in
3   the beginning, the issue was that he was -- So the
4   pepperball is really -- it can be used for multiple,
5   multiple purposes.  But one is either compliance, be it
6   pain, compliance to be OC powder, distraction devices,
7   any type of things.
8             So the combination of Cropper's positioning,
9   his body posture, prepared for a fight, the water on the
10   cell floor, all of those things were taken into account
11   when I decided to deploy the launcher and why, yes, sir.
12        Q.   Okay.  But from this description, the
13   launcher, using the launcher didn't play any part in
14   them restraining Cropper on the floor, did it?
15        A.   So again, the goal at that point is control
16   with a launcher from a distance.  So our last thing is
17   to send five officers in on any inmate into a small cell
18   where there's metal bunks, there's hazards.  The inmate
19   could have anything in his waistband.  So the last thing
20   we really want to do is send five officers into a cell
21   to get hurt.
22             So the goal of the launcher is to get
23   compliance from a distance.  So the deployment of the
24   launcher at that point was made due to the

Cheryl A. Anthony, LLC
(302) 674-8884

---

68

1   circumstances, due to the layout of the cell, Cropper's
2   positioning, a million different things, to include not
3   wanting to send five officers into a cell where one of
4   them could get hurt.
5        Q.   All right.  Do you realistically believe
6   those five officers went in and that Cropper might
7   injure one of them?
8        A.   I mean realistic or not, it's a concern that
9   we have to have.
10        Q.   Did you have a concern about Cropper being
11   injured?
12        A.   At that point, it's -- I'm not saying I'm
13   not concerned about an inmate.  But at that point he had
14   been given plenty of opportunity, plenty of warning,
15   plenty of advice, plenty of ample, ample opportunity to
16   comply, and he made his decision.  It's not a lack of
17   caring or compassion.  It's a compliance or
18   noncompliance at that point.
19        Q.   Well, as far as you are concerned about
20   whether the correctional officers would be injured, but
21   I'm going to take it at that point you weren't really
22   concerned about whether Cropper was going to be injured?
23        A.   If that's an assumption you would like to
24   make off what I said, then that's fine.

Cheryl A. Anthony, LLC
(302) 674-8884

---

**73**

1  preparation in case we did have the launcher.
2  Lieutenant Wallace could have told him during his
3  discussion with him before QRT was activated. I'm
4  unsure whether anyone had made him aware that the
5  launcher was present at the time.
6        Q.    Okay. I guess then what I'm suggesting is
7  that it sounds like he's holding a blanket because he
8  anticipates the launcher might be used. Is that a fair
9  assumption?
10       A.    Yes, sir.
11       Q.    Okay. So you see that he has that. Now,
12 back when we were, I gave Inmate Cropper two direct
13 orders to get on the ground with his hands behind his
14 back. Inmate Cropper did not comply.
15       A.    Uh-huh.
16       Q.    At this time, because of the blanket, I
17 deployed approximately five rounds into the blanket that
18 Inmate Cropper was holding, while continuing to give
19 direct orders for him to get on the ground.
20             Are you with me there?
21       A.    Yes, sir.
22       Q.    Now, you said there was a lot of noise,
23 either Cropper hollering or other people hollering. And
24 I've watched the video, and there is a lot of noise.

Cheryl A. Anthony, LLC
(302) 674-8884

**74**

1  Did you have any concern that Cropper couldn't hear you?
2        A.    No. I mean I was giving very loud
3  directives. And obviously -- So here's the thing.
4  Cropper knew what we were after as far as compliance,
5  whether he come to the door, whether it be lay on the
6  ground, because I think we went back and forth between
7  get on the ground, put your hands behind your back, or
8  come to the door and cuff up, one or the other.
9              He understood what we were looking for, as
10 far as directives and compliance. And I think, you
11 know, the main goal was obviously, like you said, he was
12 holding the blanket. So he was ready for a fight at the
13 time.
14       Q.    At that point, prior to firing pepperballs
15 at him, did you realistically believe that the
16 pepperballs were going to change his mind and make him
17 cooperate?
18       A.    So that was the hope, yes.
19       Q.    I know it was the hope. But did you think
20 it was going to work realistically, knowing Cropper?
21       A.    So again, I mean that's where you go as far
22 as the pepperball launcher. You can use it in many
23 different ways and fashions. Again, I've been through
24 the initial pepperball training. I've been through two

Cheryl A. Anthony, LLC
(302) 674-8884

**75**

1  refresher trainings and then back through the basic
2  pepperball launcher. And each time I can gather you get
3  more training, more thought process, more situations
4  that you are put in. It can be used for many different
5  purposes, whether it be a show of force, distraction
6  device, impact weapon, OC, PAVA powder.
7              So at that point it's really a -- It's a
8  consistent, changing situation that, you know,
9  realistically you hope at some point that one of those
10 things would gain compliance.
11       Q.    But realistically, when you are there and
12 Cropper is holding a blanket, you didn't believe he was
13 going to cooperate because of pepperballs, did you?
14       A.    Well, I believe that he was ready to attempt
15 to shield the pepperballs as best he could.
16       Q.    Well, meaning that he wasn't going to
17 cooperate because of pepperballs, correct?
18       A.    Correct. But everybody is -- Everybody has
19 that mindset until it's -- you know, it's different
20 every time. Somebody could hear the sound of the
21 launcher being deployed, and that clicks in something
22 and says: Okay. I want no parts of this. Somebody
23 could get an impact from a pepperball round and say:
24 Oh, man that hurt. Let me comply.

Cheryl A. Anthony, LLC
(302) 674-8884

**76**

1              You know, the PAVA powder could come down
2  and attack the respiratory system or the eyes or any
3  type of physical effects and say: Oh, man, this is no
4  fun. I want no parts of this. And then they become
5  compliant at that point.
6              I specifically remember the incident we
7  referenced earlier. That's exactly what happened
8  before. The guy was ready for a fight, tied stuff
9  around his face, and the deployment of the pepperball
10 rounds gained compliance. So that's always what the
11 goal is. So whether you realistically think he's going
12 to comply or not, that's an ever-changing expectation.
13       Q.    All right. Picking up, I don't think I read
14 this one yet. At this time, because of the blanket, I
15 deployed approximately five rounds into the blanket that
16 Inmate Cropper was holding while continuing to give
17 direct orders for him to get on the ground.
18       A.    Correct.
19       Q.    Why did you fire five rounds into the
20 blanket?
21       A.    So again, going back to the multiple facets
22 that you can use the launcher for is I knew that
23 applying the rounds to the blanket would not cause --
24 the impact on the blanket would cause them not to

Cheryl A. Anthony, LLC
(302) 674-8884

**PA024**

Cropper v McCarthy, et al.                                                                6/22/2021 Depo of Robert Mock

81

1   Q.   All right.  I see the sentence that you read
2   about the 15 to 20 rounds.
3   A.   Uh-huh.
4   Q.   Are you saying there was a pause between the
5   five rounds and the 15 to 20 rounds when you again gave
6   orders to Cropper to get on the ground?
7   A.   Yes.  So it says I deployed approximately
8   five rounds into the blanket while continuing to give
9   direct orders, after again not complying.  So yes, there
10  was some sort of a break between the five and the next
11  volley of 15 to 20 of direct fire.
12  Q.   How much of a break?  How much time?
13  A.   That would be speculation.  I'm unsure about
14  the specific time.  It wasn't 30 or 60 seconds, but I
15  would say seconds.
16  Q.   It says:  During the direct fire, Inmate
17  Cropper lunged towards the door and was yelling come on.
18  Was that during the 15 to 20 rounds or during the
19  initial five rounds?
20  A.   That was during the 15 to 20.
21  Q.   All right.  You say he lunged toward the
22  door yelling, come on, and you continued to fire the
23  pepperballs?
24  A.   I continued with approximately ten more

Cheryl A. Anthony, LLC
(302) 674-8884

82

1   rounds and then ordered QRT to fire, yes.
2   Q.   Where did you aim those ten more rounds?
3   A.   To the large muscle groups and the back of
4   the cell, extremities, anything that was visible without
5   the blanket inhibiting -- Cropper was going up and down
6   with the blanket, an up-and-down motion to block the
7   pepperballs, which caused me to go up and down with the
8   launcher which, again, is where it comes in with the
9   area saturation and shooting toward the back of the cell
10  wall.
11  Q.   As you were going up and down with the
12  launcher, you actually launched pepperballs right at his
13  face, didn't you?
14  A.   I never aimed for Inmate Cropper's face.
15  Q.   Did you hit him in the face with the
16  pepperball?
17  A.   At the time I did not know that I had shot
18  him in the face.  Afterwards, obviously, I did discover
19  that he did get hit with a round in the face.
20  Q.   So you had to be shooting up that high to
21  hit him in the eye.  It didn't ricochet off something
22  else, did it?
23  A.   I am unclear.  At no time during this QRT
24  extraction did I aim at Inmate Cropper's eye or face.

Cheryl A. Anthony, LLC
(302) 674-8884

83

1   Q.   Were you not a very good shot with it?
2   A.   That would be an assumption for one to make,
3   if that's an assumption that needs to be made.  I mean
4   it has nothing to do with skill level.  I was going
5   between the back of the cell wall and extremities to
6   include his fingertips holding the blanket and the large
7   muscle groups and the lower extremities, as well as the
8   area saturation at the back of the cell and of which his
9   head and in between those two target areas.
10  Q.   Well, I guess I'm saying you said:  I didn't
11  aim at his head or his eye --
12  A.   Correct.
13  Q.   -- but I hit him in the head or eye.  How
14  did that happen?
15  A.   So as well as me going between the two
16  target areas above Inmate Cropper, his fingertips
17  holding the blanket, the large muscle groups in the
18  thighs and his lower extremities, he was also jumping up
19  and down, moving back and forth, moving the blanket,
20  bobbing, weaving, whatever you want to call it, so his
21  movement, as well, may have contributed to that poor
22  placement of a round.
23  Q.   Did you see him moving back and forth?
24  A.   I did.

Cheryl A. Anthony, LLC
(302) 674-8884

84

1   Q.   Didn't it concern you that if he's moving
2   back and forth and jumping up and down that a pepperball
3   might hit him in the face?
4   A.   So at that point there is no expectation
5   that I should have to take into account the inmate's
6   actions.  I'm aiming for what I've been trained to aim
7   for.  And again, that is the back of the cell wall, the
8   upper and lower extremities and the large muscle groups?
9   Q.   Were you ever trained that if you are
10  shooting pepperballs at somebody's body, they might bend
11  down, and you have to watch out for that because you're
12  going to hit them in the face?
13  A.   Yes.
14  Q.   Well, did you?  Did you watch out for that
15  when he started moving around?
16  A.   So truth be told, I don't -- I wasn't aiming
17  low.  If you dissect the video, I think I can speculate
18  as to when Inmate Cropper was shot in the face.  But I
19  don't believe I was aiming low at the time that
20  happened.  I believe it was him standing up at a time
21  that I was aiming up, so just poor timing.
22  Q.   Well, what were you aiming at when he got
23  hit?
24  A.   Again, the back of the cell wall.

Cheryl A. Anthony, LLC
(302) 674-8884

PA025

Cropper v McCarthy, et al.                                                                 6/22/2021 Depo of Robert Mock

85

```
11:57:14  1      Q.     But it was low enough that if he stood up,
11:57:17  2  it would hit him in the face?
11:57:19  3      A.     Correct.  So there's nothing in training
11:57:22  4  that says I have to aim three feet above the inmate, ten
11:57:26  5  feet above the inmate, six inches above the inmate.  It
11:57:29  6  was above the inmate at the time.
11:57:31  7      Q.     So if he's crouched down, it's okay to shoot
11:57:34  8  right above his head and assume he's not going to stand
11:57:37  9  up?
11:57:38 10      A.     There was no assumption made.  He had made
11:57:40 11  the decision to stand up or bob and weave or move that
11:57:44 12  way.  Again, I wasn't moving toward his face at all.
11:57:48 13      Q.     Are you telling us it's his fault that he
11:57:51 14  got shot in the eye?
11:57:52 15      A.     I didn't say that at all.
11:57:58 16      Q.     All right.  Eventually, they take Cropper to
11:58:00 17  the ground.  He's on his face.  And apparently, he's not
11:58:04 18  wanting to give up his hands.  Is that what happened?
11:58:08 19      A.     Yes, sir.
11:58:09 20      Q.     Is that fairly common that inmates in this
11:58:14 21  situation will try not to give up their hands?
11:58:14 22      A.     Yes, a continued display of noncompliance.
11:58:21 23      Q.     Now, it says:  After approximately a minute
11:58:23 24  of continuing to struggle with restraining inmate
```

Cheryl A. Anthony, LLC
(302) 674-8884

86

```
11:58:27  1  Cropper, I entered the cell and sprayed Inmate Cropper
11:58:29  2  in his facial area with my Sabre Red.  Is that what
11:58:33  3  happened?
11:58:37  4      A.     Yes, sir.
11:58:37  5      Q.     Just as a diversion -- and we'll see that in
11:58:40  6  the video, if we watch that -- that he was toward the
11:58:43  7  back of the cell with a bunk on one side and really not
11:58:48  8  much room at all for the officers to try to manipulate
11:58:50  9  him.  Would you say that's a fair observation?
11:58:53 10      A.     It's a very close quarters encounter, yes.
11:58:56 11      Q.     Why didn't they just drag him back toward
11:59:01 12  the cell door where they had a little more room?
11:59:02 13      A.     So originally, he was in the very back left
11:59:06 14  corner on top of the bunk.  So they were able to get him
11:59:09 15  onto the ground outside of the bunk.  But I mean if you
11:59:12 16  see it in the video, you see it any other time QRT is
11:59:15 17  deployed.  There's really not a -- You can plan and
11:59:18 18  train and train and train and train, and it never goes
11:59:22 19  according to plan.
11:59:23 20           So at that point, it's really -- the main
         21  concern is just get him down, get him secured, because
         22  inmates run out of the cell.  So the idea is to keep him
         23  as far away from the cell door and in that confined
         24  area.
```

Cheryl A. Anthony, LLC
(302) 674-8884

87

```
         1      A.     Well, he's down on his face, with officers
         2  holding him down.  I don't understand why he couldn't
         3  have been drug back about four or five feet so they
         4  could actually reach under him and get his arms.
         5      Q.     No, I mean I don't necessarily disagree with
         6  you.  That could have happened, yes.
         7      Q.     All right.  Did you have training with using
         8  Sabre Red?
         9      A.     Yes, sir.
12:00:15 10      Q.     And how far away should you be from somebody
12:00:18 11  when you're deploying Sabre Red?  What's the minimum
         12  distance?
12:00:17 13      A.     There is no minimum distance, I believe.
         14  But it threw me off.  I'm not sure.
12:00:18 15      Q.     If other correctional officers recall being
12:00:22 16  trained that there's a minimum distance, would you
12:00:22 17  disagree with them?
12:00:22 18      A.     No.  It's literally just a -- It caught me
12:00:22 19  off guard.  I would actually have to think about it.
12:00:20 20      Q.     Well, were you trained that there was a
12:00:28 21  minimum distance and that you should not get closer than
12:00:32 22  that to spray an inmate?
12:00:34 23      A.     Okay.  So I mean I would say one to three
12:00:37 24  feet, one to six feet.  The maximum distance of the
```

Cheryl A. Anthony, LLC
(302) 674-8884

88

```
12:00:43  1  Sabre Red that we carry is a six feet cone, so say a
12:00:46  2  minimum distance of six inches, a foot, something like
12:00:51  3  that.  Specifics, I know that -- I'll put it this way.
12:00:56  4  There is a minimum distance, yes.  Did I close that
12:01:00  5  minimum distance when I sprayed him in the face?  No.
12:01:02  6      Q.     I'm sorry.  Did you --
12:01:04  7      A.     I didn't put it to his skin and spray him in
12:01:07  8  the face.
12:01:08  9      Q.     How far way from his face was he?
12:01:11 10      A.     I would say about six to twelve inches.
12:01:13 11      Q.     And your testimony is that's permitted?
12:01:18 12      A.     Yes.
12:01:21 13      Q.     But this would reach about six feet, this
12:01:27 14  Sabre Red?
12:01:28 15      A.     I mean it could.  It's very ineffective at
12:01:31 16  that point with the cone.
12:01:32 17      Q.     Is it pretty effective at, say, three feet?
12:01:35 18      A.     I would say three feet, depending on the
12:01:38 19  situation.  If you're spraying multiple inmates, you
12:01:41 20  want to get a little bit closer, a little bit wider.  It
12:01:45 21  depends on the situation.  It is effective at three
12:01:48 22  feet.
12:01:49 23      Q.     Well, you had Sabre Red to be able to use.
12:01:51 24  Why didn't somebody just walk in and spray Cropper with
```

Cheryl A. Anthony, LLC
(302) 674-8884

**PA026**

Cropper v McCarthy, et al.                                                      6/22/2021 Depo of Robert Mock

---

**85**

1    Q.    But it was low enough that if he stood up,
2  it would hit him in the face?
3    A.    **Correct.  So there's nothing in training**
4  **that says I have to aim three feet above the inmate, ten**
5  **feet above the inmate, six inches above the inmate.  It**
6  **was above the inmate at the time.**
7    Q.    So if he's crouched down, it's okay to shoot
8  right above his head and assume he's not going to stand
9  up?
10    A.    **There was no assumption made.  He had made**
11  **the decision to stand up or bob and weave or move that**
12  **way.  Again, I wasn't moving his face at all.**
13    Q.    Are you telling us it's his fault that he
14  got shot in the eye?
15    A.    **I didn't say that at all.**
16    Q.    All right.  Eventually, they take Cropper to
17  the ground.  He's on his face.  And apparently, he's not
18  wanting to give up his hands.  Is that what happened?
19    A.    **Yes, sir.**
20    Q.    Is that fairly common that inmates in this
21  situation will try not to give up their hands?
22    A.    **Yes, a continued display of noncompliance.**
23    Q.    Now, it says:  After approximately a minute
24  of continuing to struggle with restraining inmate

Cheryl A. Anthony, LLC
(302) 674-8884

---

**86**

1  Cropper, I entered the cell and sprayed Inmate Cropper
2  in his facial area with my Sabre Red.  Is that what
3  happened?
4    A.    **Yes, sir.**
5    Q.    Just as a diversion -- and we'll see that in
6  the video, if we watch that -- that he was toward the
7  back of the cell with a bunk on one side and really not
8  much room at all for the officers to try to manipulate
9  him.  Would you say that's a fair observation?
10    A.    **It's a very close quarters encounter, yes.**
11    Q.    Why didn't they just drag him back toward
12  the cell door where they had a little more room?
13    A.    **So originally, he was in the very back left**
14  **corner on top of the bunk.  So they were able to get him**
15  **onto the ground outside of the bunk.  But I mean if you**
16  **see it in the video, you see it any other time QRT is**
17  **deployed.  There's really not a -- You can plan and**
18  **train and train and train and train, and it never goes**
19  **according to plan.**
20        **So at that point, it's really -- the main**
21  **concern is just get him down, get him secured, because**
22  **inmates run out of the cell.  So the idea is to keep him**
23  **as far away from the cell door and in that confined**
24  **area.**

Cheryl A. Anthony, LLC
(302) 674-8884

---

**87**

1    Q.    Well, he's down on his face, with officers
2  holding him down.  I don't understand why he couldn't
3  have been drug back about four or five feet so they
4  could actually reach under him and get his arms.
5    A.    **No, I mean I don't necessarily disagree with**
6  **you.  That could have happened, yes.**
7    Q.    All right.  Did you have training with using
8  Sabre Red?
9    A.    **Yes, sir.**
10    Q.    And how far away should you be from somebody
11  when you're deploying Sabre Red?  What's the minimum
12  distance?
13    A.    **There is no minimum distance, I believe.**
14  **But it threw me off.  I'm not sure.**
15    Q.    If other correctional officers recall being
16  trained that there's a minimum distance, would you
17  disagree with them?
18    A.    **No.  It's literally just a -- It caught me**
19  **off guard.  I would actually have to think about it.**
20    Q.    Well, were you trained that there was a
21  minimum distance and that you should not get closer than
22  that to spray an inmate?
23    A.    **Okay.  So I mean I would say one to three**
24  **feet, one to six feet.  The maximum distance of the**

Cheryl A. Anthony, LLC
(302) 674-8884

---

**88**

1  **Sabre Red that we carry is a six feet cone, so say a**
2  **minimum distance of six inches, a foot, something like**
3  **that.  Specifics, I know that -- I'll put it this way.**
4  **There is a minimum distance, yes.  Did I close that**
5  **minimum distance when I sprayed him in the face?  No.**
6    Q.    I'm sorry.  Did you --
7    A.    **I didn't put it to his skin and spray him in**
8  **the face.**
9    Q.    How far way from his face was he?
10    A.    **I would say about six to twelve inches.**
11    Q.    And your testimony is that's permitted?
12    A.    **Yes.**
13    Q.    But this would reach about six feet, this
14  Sabre Red?
15    A.    **I mean it could.  It's very ineffective at**
16  **that point with the cone.**
17    Q.    Is it pretty effective at, say, three feet?
18    A.    **I would say three feet, depending on the**
19  **situation.  If you're spraying multiple inmates, you**
20  **want to get a little bit closer, a little bit wider.  It**
21  **depends on the situation.  It is effective at three**
22  **feet.**
23    Q.    Well, you had Sabre Red to be able to use.
24  Why didn't somebody just walk in and spray Cropper with

Cheryl A. Anthony, LLC
(302) 674-8884

**PA027**

Cropper v McCarthy, et al.                                                              6/22/2021 Depo of Robert Mock

---

**89**

1  Sabre Red and then take him down?

2      A.      Before the launcher, you mean?

3      Q.      Yes.

4      A.      Because in that housing unit you're not

5  allowed to enter the cell without an inmate being

6  handcuffed, unless it's a QRT.

7      Q.      Well, it was a QRT, wasn't it?

8      A.      Yeah.  So you're talking -- Are you talking

9  about why didn't we spray him before the QRT and the

10  pepperball launcher was deployed?

11      Q.      Or the QRT comes in with pepper spray and

12  sprays him?

13      A.      Oh, no.  I don't disagree.  I mean it could

14  have been effective.  Like I said before, the

15  speculation of what could have happened or what would

16  have been effective is subjective at this point.

17      Q.      Well, we can be pretty sure that if they

18  went in and just sprayed him with pepper spray, they

19  weren't going to rupture an eyeball, were they?

20      A.      That most likely would not have ruptured an

21  eyeball, correct.

22      Q.      And if they had just gone in and taken him

23  down like they ended up doing after all the pepperball

24  shots, he wasn't going to lose his eye because of that

Cheryl A. Anthony, LLC
(302) 674-8884

---

**90**

1  either, was he?

2      A.      If they had entered the cell without the

3  launcher, no.

4      Q.      So the only thing that was going to cause

5  him to lose an eye was the launcher?

6      A.      Agreed.

7      Q.      Do you think the launcher was the least

8  dangerous way to get him to comply?

9      A.      So then -- I mean again, we're going back to

10  what I said before.  It's really about the situation,

11  the posture, the positioning, the cell, the water on the

12  floor, everything.

13          So again, the use of the launcher is the

14  goal -- the goal is to gain compliance from a distance

15  without having to put any officers in jeopardy or an

16  inmate, for that fact -- I have a feeling that's what

17  you're getting ready to ask -- or inmates in jeopardy.

18          So again, the show of force with the

19  launcher, the noise of the launcher, the rounds being

20  deployed, the impact -- So here's the thing.  I mean

21  it's speculation.  If I would have fired one round from

22  the pepperball launcher or the first five and he would

23  have said, okay, I'm done, I comply, then he had that

24  option.  So again, we can say:  Would this have worked?

Cheryl A. Anthony, LLC
(302) 674-8884

**PA028**

---

**91**

1  Would this have worked?  Well, if he would complied from

2  the beginning, that would have worked.

3      Q.      Well, don't you take into account what's the

4  safest way to do it?

5      A.      Absolutely.  But again, you're getting

6  subjective as to what's safe for who.  So is it safe

7  for the inmate, or is it safe for the officer?  That's

8  where -- And I don't mean to rant.  But at the same

9  time, that's where you get so objective, as far as that

10  quote, unquote Monday morning quarterback.

11      Q.      Well, I don't think it's Monday morning

12  quarterback to say that you could have used pepper

13  spray, and you apparently never considered it.  Is that

14  fair?

15      A.      That would have required us to close the

16  distance and enter the cell.

17      Q.      Would it be fair to say that when you were

18  shooting the pepperballs, you were shooting them close

19  enough to Cropper that if he moved or lunged, he was

20  going to get hit in the face?

21      A.      That is always a concern.

22      Q.      And you didn't --

23      A.      When deploying with a pepperball, that could

24  always, in every single situation, be a concern.

Cheryl A. Anthony, LLC
(302) 674-8884

---

**92**

1      Q.      Well, what steps did you take to try to make

2  sure it didn't happen?

3      A.      I didn't aim at his face.

4      Q.      Did any of the QRT ask you to come in and

5  spray Cropper in the face?

6      A.      No, they did not.

7      Q.      I thought you said you were actually there

8  to just work the pepperball launcher.  Correct?

9      A.      Correct.

10      Q.      Well, pepper spray in the face is not the

11  pepperball launcher, is it?

12      A.      It is not.

13      Q.      So you were doing something that you weren't

14  there to do?

15      A.      That's subjective.  Any -- I apologize.

16  Sorry.  Any officer in any capacity in any situation is

17  authorized to use OC spray.

18      Q.      Rather than going through all of the rest of

19  the incident reports in a lot of detail, I just want to

20  ask you -- because several of them mentioned what they

21  would call a fighting stance -- did you see Cropper at

22  any point being in a fighting stance after you had shot

23  the pepperballs?

24      A.      So there was actually a logistical mistake

Cheryl A. Anthony, LLC
(302) 674-8884

---

**105**

1    you sprayed Mr. Cropper with the pepper spray, I note

2    that you reentered the cell and appeared to point the

3    pepperball launcher at him.  Were you going to shoot him

4    with the pepperball launcher while he was lying on the

5    ground?

6        A.     So it was a staging purpose only,

7    repositioning so that if at any point -- So again, age,

8    gender, any type of build, it doesn't matter.  I have

9    been on QRTs personally where it's a five foot five,

10   120-pound guy, but he works out every single day.  If I

11   had to guess, he was probably in his 40s.  And he pushed

12   four or five of us up off the ground that were on his

13   back.  He works out every day.

14         So it was just a repositioning in order to

15   have that availability should anything persist in

16   noncompliance or any other type of escalation.

17       Q.     Well, first of all, Cropper is not a five

18   foot five guy that works out all the time, is he?

19        A.     From what I remember, he does work out.  He

20   likes to do a lot of shadow boxing in his cell.

21       Q.     All right.  But at any rate, your intention

22   was, if necessary, you would shoot him with a pepperball

23   gun while he was lying on the cell floor?

24        A.     Again, if the noncompliance continued or any

Cheryl A. Anthony, LLC
(302) 674-8884

**107**

1    this off here.  All right.  There we are, back to

2    normal.

3    BY MR. HAMPTON:

4       Q.     Just to make sure I completely understood,

5    you're telling us that this might be the first time that

6    you used pepperball after your training?

7        A.     Yes, sir.  In fact, during our break I went

8    back into DACS, and it is the first utilization of

9    pepperball after my training.

10       Q.     Was there a point when it was decided that

11   if somebody was not going to cooperate, that the initial

12   deployment of force would be pepperball, as a matter of

13   course?

14        A.     So I don't think there was ever a decision

15   or anything -- any specific factors that would decide

16   that.  I think it was situational.  It was always there.

17   Now, I did notice, when I was going back in DACS, it was

18   not the first time that I had taken the launcher on a

19   QRT.  It was just the first time that I had deployed it

20   since my training.  So it was more of a show of force.

21         If the QRT is going to be there, you want to

22   have the pepperball so that you have that option.  At no

23   time, I would say, I think -- I didn't read every

24   report.  But I would say four or five times before this

Cheryl A. Anthony, LLC
(302) 674-8884

**108**

1    type of escalation from him that would require or

2    justify the use of force model the use of the pepperball

3    launcher, yes.

4       Q.     The one thing I remember that I think I

5    skipped when we were going through the training

6    materials -- and I don't really feel like going back,

7    but I'll see if you remember it -- it was telling you

8    that when you want to target something, that you shoot a

9    little bit lower than the target to avoid, actually, you

10   know, hitting something.  In other words, to continue

11   going too high, aim a little bit low.  Is that a fair

12   way to say that you were trained?

13        A.     In order to avoid hitting low, aim a little

14   bit high?

15       Q.     No, the converse; to avoid hitting high, aim

16   a little bit low.

17        A.     I mean I think that's accurate.

18        MR. HAMPTON:  Okay.  All right.  Well, I

19   don't really want to get back to that.  Let me see what

20   else I might have.  I'm going to turn this off in a

21   moment, unless -- Rebecca, are you going to want to ask

22   any questions about the video?

23        MS. SONG:  No questions.

24        MR. HAMPTON:  All right.  Then I'll turn

Cheryl A. Anthony, LLC
(302) 674-8884

**108**

1    incident, after my training, I went on a QRT with the

2    launcher, and it was not utilized.

3       Q.     Have you used it since?

4        A.     After this situation, I did, yes.

5       Q.     A cell extraction?

6        A.     That was the yard incident that I --

7         Oh, the yard incident.

8        A.     -- spoke of earlier, yes, sir.

9       Q.     Has there been any change in the pepperball

10   policy that you are aware of since this incident with

11   Mr. Cropper?

12        A.     No.  The initial training I got, the

13   refresher training, and the training I just received

14   back in May has all been the same.

15       Q.     I had another question on my mind, and now

16   it ran away.  Let's see if I can bring it back.

17         So the training has remained the same.  And

18   is it still the standard policy that when a QRT comes

19   out, that a pepperball launcher goes with them?

20        A.     So really, that's dependent on facility by

21   facility.  I don't work at James T. Vaughn anymore.  I

22   know here at HRYCI, there's very minimal staff trained

23   on it, which they're trying to train more as COVID

24   subsides and all that.

Cheryl A. Anthony, LLC
(302) 674-8884

**PA029**

Cropper v.
McCarthy

Corporal Megan McCarthy
September 29, 2021

CORPORAL MEGAN McCARTHY                                    Page 37

1    A.    No.
2    Q.    All right.  Now, did Sergeant
3  Mock tell him to put his hands up and walk
4  towards the door?
5    A.    No.
6    Q.    Okay.
7    A.    He just said come to the door
8  and cuff up.
9    Q.    No further instructions?
10  Like, you have to walk -- you have to put
11  your hands up, that kind of thing?
12    A.    No.
13    Q.    And would you expect him to
14  put his hands up if he is being shot with
15  pepper bulls and not trying to protect
16  himself?
17    A.    Can you repeat it one more
18  time, please?
19    Q.    Let's ask it this way.  If
20  somebody is shooting you with pepper balls,
21  is it your understanding that that hurts if
22  they hit you?
23    A.    They sting a little bit.
24    Q.    Have you ever been shot with

CORPORAL MEGAN McCARTHY                                    Page 38

1  one?
2    A.    Yes, I have.
3    Q.    And did it hurt?
4    A.    It stings.  Like I said, it
5  stings a little bit.
6    Q.    Well, it's hard enough to
7  rupture somebody's eyeball if it hits you in
8  the eye; right?  You're aware of that?
9    A.    Uh-huh.
10    Q.    Yes?
11    A.    If it hits you in your eye.
12    Q.    Well, you said uh-huh.  I am
13  just trying to make sure that was a yes.
14    A.    You're saying if it hits you
15  in your eye it's going rupture it?
16    Q.    All right.  Let's start over
17  here because I am getting a little confused
18  and I don't want to confuse you.
19        We know in this case that Mr.
20  Cropper ended up with ruptured eyeball.  You
21  were aware of that or not?
22    A.    Yes.
23    Q.    Okay.  And that was from
24  getting hit in the eye by a pepper ball, was

CORPORAL MEGAN McCARTHY                                    Page 39

1  it not?
2    A.    Yes.
3    Q.    So, obviously, the pepper
4  balls have enough force that they can
5  rupture your eyeball if they hit you in it;
6  correct?
7    A.    Yes.
8    Q.    And this part you may not
9  know.  But if you were to look at the
10  medical records from within the next day or
11  so, there was mention of bruises on his body
12  from apparently from the pepper balls.
13        Were you aware that they could
14  bruise you?
15    A.    Yeah.
16    Q.    And all of that would be
17  painful, would it not?
18    A.    With your eyeball being
19  ruptured, yes, painful.  But the paint balls
20  hitting your body, I mean, it will be a
21  bruise.  It will sting for a little bit, but
22  that's all it is.
23    Q.    If somebody is continuing to
24  rapid fire paint balls or pepper balls at

CORPORAL MEGAN McCARTHY                                    Page 40

1  you and you have a blanket to try to protect
2  yourself from them, is it going to be likely
3  that you're going to drop the blanket and
4  put your hands up and walk slowly towards
5  the person who is shooting you with pepper
6  balls?
7    A.    I would put the blanket down
8  and turn around.
9    Q.    That is what you would do,
10  huh?  So, they could shoot you in the back
11  instead of in the front?
12    A.    Yeah.  It's my back.  It's not
13  going to hurt -- it's not going to hurt as
14  much.
15    Q.    Okay.  All right.  If you
16  wanted, really wanted him to come to the
17  door and cuff up, wouldn't a reasonable
18  thing to do be to pause shooting the
19  pepper balls and give him an opportunity to
20  do that?
21    A.    Give it a pause?
22    Q.    Yeah.  Stop shooting him
23  rapidly and let him have a moment to see if
24  he will come to the door?

Cropper v.
McCarthy

Corporal Megan McCarthy
September 29, 2021

CORPORAL MEGAN McCARTHY                                    Page 49

1    Q.   All right. Has Sergeant Mock
2  talked to you any time about what happened?
3    A.   No.
4    Q.   Has he talked to you at any
5  time since this suit was filed?
6    A.   No. He is up at Gander. We
7  don't talk at all.
8    Q.   I know. I mean, theoretically
9  you could talk outside of work, but I am not
10 assuming that you did.
11   A.   Yeah, no.
12   Q.   Have you had any pepper ball
13 training ever?
14   A.   No, I have not. They only
15 give pepper ball training to the ones that
16 are using it. I have never used the pepper
17 ball.
18   Q.   Well, given the way that
19 Sergeant Mock was shooting the pepper balls
20 generally in the area right around Mr.
21 Cropper, and Mr. Cropper was moving a fair
22 amount, is it really a surprise that he got
23 shot in the face?
24   A.   No.

CORPORAL MEGAN McCARTHY                                    Page 50

1    Q.   He had been shooting at the
2  ceiling, he obviously wouldn't have hit him
3  in the face; right?
4    A.   Up towards the wall you mean?
5    Q.   No, the ceiling. If he had
6  been shooting towards the ceiling, he
7  wouldn't shoot him in the face; right?
8    A.   He can still shoot up towards
9  the wall. You wouldn't get in the face
10 either.
11   Q.   All right. Did you see
12 Sergeant Mock come in and pepper spray
13 Cropper at some point during the -- after he
14 was already on the ground and they were
15 trying to cuff him?
16   A.   No. I did not see that.
17   Q.   Did you see him walk? You
18 didn't see him walk in and --
19   A.   I saw him walk in, but that is
20 about it.
21   Q.   You didn't see him reach down
22 around where the other folks were?
23   A.   No. I saw him reach down, but
24 I don't -- I don't know what he was doing.

CORPORAL MEGAN McCARTHY                                    Page 51

1  I didn't know what he was doing honestly.
2    Q.   From all of the other incident
3  reports that have talked about it,
4  apparently he sprayed Cropper in the face
5  with pepper ball spray after while they were
6  trying to cuff him.
7    A.   Okay.
8    Q.   Would you see a reason for
9  that?
10   A.   If we are not -- we are still
11 not complying, then you got the pepper ball
12 gun and you're still not complying with me,
13 then I guess the pepper spray would be
14 another way of trying to get him to cuff up.
15   Q.   I guess the better question
16 that I should have asked really is, when you
17 were trained with pepper spray, were you
18 told there is a minimum distance that you
19 should be away from the inmate?
20        In other words, a foot, two
21 feet, six inches? Have you been taught at
22 all about how close you can be when you
23 shoot somebody in the face with pepper
24 spray?

CORPORAL MEGAN McCARTHY                                    Page 52

1    A.   Trying to remember because we
2  had training recently. I can't remember the
3  exact number. And we just had training,
4  too.
5    Q.   Well, are you allowed to put
6  it right up against their face and spray
7  them?
8    A.   No.
9    Q.   I played the part just shortly
10 before the team arrived at the cell, and
11 then there was the rest of the incident.
12        Do you recall at all before
13 this happening anybody suggesting or talking
14 about the possibility of getting somebody
15 from mental health to talk to Mr. Cropper?
16   A.   I don't know if it was asked
17 for. I don't know.
18   Q.   It wasn't done that you were
19 aware of, is that fair to say?
20   A.   Yeah. Like I said before, I
21 don't know what happened in the building
22 before I got there, but --
23   Q.   When you're moving somebody to
24 move them to a higher security level like

Cropper v.
McCarthy

Corporal Megan McCarthy
September 29, 2021

---

CORPORAL MEGAN McCARTHY                    Page 53

1  this with Mr. Cropper, is there any time
2  limit on that?  I mean, does it have to be
3  done within 20 minutes, an hour, two hours,
4  or is it not that time sensitive?
5      A.    It has to be done as soon as
6  when the inmate is told.
7      Q.    I understand that.
8      A.    Because sometimes when we tell
9  them that they are moving, we will normally
10 have another inmate coming in to get into
11 that cell.
12     Q.    Well, this is he is just to go
13 to a higher security level, not because of
14 another inmate coming in.
15           If that is the issue, is there
16 a particular rush on getting him to the new
17 cell?
18     A.    No, just to get it done.
19     Q.    Go ahead and write him up.  I
20 don't care.  All right.  I am going let you
21 go here at this point, but the other
22 attorney has the opportunity to ask you
23 questions if she'd like to.
24

---

CORPORAL MEGAN McCARTHY                    Page 54

1          MS. SONG: I do.
2  BY MS. SONG:
3      Q.    Corporal McCarthy, let me know
4  if you have any issues hearing me.
5      A.    Okay.
6      Q.    Okay.  So, earlier Mr. Hampton
7  asked you a little bit about the use of
8  pepper spray or Cap-Stun.  Let me ask you.
9          Do you remember after the QRT
10 was given the order to fire, do you remember
11 if Mr. Cropper continued to resist?
12     A.    Yes.
13     Q.    How did he resist?
14     A.    Staying in the back of the
15 cell and not moving, not -- just talking.
16     Q.    Did you see the QRT able to
17 get him on the ground?
18     A.    Yeah.  They struggled because
19 he was still refusing to cuff up.
20     Q.    Could you be a little more
21 specific in the way he struggled that you
22 remember?
23     A.    He was moving his whole body,
24 his arms.  He was refusing to put his -- he

---

CORPORAL MEGAN McCARTHY                    Page 55

1  was holding his arms to where they couldn't
2  go behind his back.
3      Q.    And is that -- does that
4  present a concern for the safety of the
5  people involved in this extraction?
6      A.    Yes.
7      Q.    How does that?  What is the
8  concern there?
9      A.    Because easily at that point
10 Cropper could -- he could easily swing on an
11 officer or kick them, use their body, take
12 them down, either or.  It doesn't matter the
13 size of a person.  It's all about the
14 strength.
15     Q.    And do you remember -- you saw
16 the video.  So, do you remember if
17 Lieutenant Mock had ordered Cropper to get
18 on the ground?
19     A.    Yes.
20     Q.    And did you -- did Mr. Cropper
21 comply and get on the ground?
22     A.    No, he didn't.
23          MS. SONG:  Okay.  I don't have
24 any other questions for corporal

---

CORPORAL MEGAN McCARTHY                    Page 56

1  McCarthy.
2          THE WITNESS: Okay.
3          MR. HAMPTON: Just a follow-up
4  about that.
5  BY MR. HAMPTON:
6      Q.    Corporal, you were aware, we
7  now know, that by the time they got him on
8  the floor he had already suffered a ruptured
9  eyeball; correct?
10     A.    Yes.
11     Q.    And would you assume that
12 would be quite painful?
13     A.    What does that mean?
14     Q.    It hurt?
15     A.    So that --
16     Q.    Getting your eyeball ruptured
17 hurt a lot.
18     A.    Understandable, but at the
19 same time your eye is hurting but you're
20 still refusing to fight the officers and not
21 comply.  So, he still has something in him.
22     Q.    Did I ask you that?
23     A.    No, but I am explaining it to
24 you.  I am answering your question.

---

Cropper v.
McCarthy

Warden Dana G. Metzger
August 15, 2018

Warden Dana G. Metzger                                    Page 69

1   had problems with Cropper in the past, and
2   he has very little in the line of
3   disciplinary actions --
4          MS. SONG: Objection to form.
5      Is there a question here?
6   BY MR. HAMPTON:
7      Q.   There will be.
8          If that is a fact, if there is
9   no history of other officers having trouble
10  with him other than Mock and there is no
11  history of him doing any of the incidents
12  that you said -- in fact, none of the
13  officers who testified said they were aware
14  of Cropper ever being violent toward any
15  correctional officers or violent toward any
16  other inmates, so his history is not a
17  violent history. If that is a fact, does
18  that change your opinions at all?
19     A.   I again go back to, I only see
20  what I see. You asked me for my
21  interpretation of the scenario. I don't
22  know the history. I don't know what went on
23  or transpired throughout the day, what kind
24  of mood he was in, what kind of mood of the

Warden Dana G. Metzger                                    Page 70

1   officers, what kind of engagement that they
2   had. I don't know. You're asking for my
3   interpretation on force. Did they have the
4   option to use that force? Yes. What made
5   them go to that use of force? I don't know.
6      Q.   Well, I'm telling you what the
7   history was with them as far as being a
8   violent person or having a lot of
9   disciplinary actions or having bad
10  interactions with correctional officers, and
11  he didn't so I'm asking you: Does that
12  change your impression at all?
13         MS. SONG: Objection.
14     Asked and answered. He's
15  given you an answer.
16         MR. HAMPTON: It wasn't
17  answered.
18         MS. SONG: Okay.
19  BY MR. HAMPTON:
20     Q.   Does that change your
21  impression at all if that's the history?
22     A.   Your interpretation of it.
23  You're giving me your interpretation. I'm
24  not going --

Warden Dana G. Metzger                                    Page 71

1      Q.   Hypothetical.
2      A.   If you're giving me your
3   hypothetical, I'm not going to say in this
4   situation. You're not giving me a
5   hypothetical. You're saying, show me the
6   situation. Here's my history and
7   interpretation of it. What do you think?
8          I'm looking at a situation
9   where a QRT responded to an inmate who was
10  refusing to comply with directives. Did
11  they use the amount of force necessary?
12  They did. In my opinion if that was their
13  choice to make that use of the force because
14  they deemed the situation to warrant it,
15  then they have that option.
16         Would I have gone in a
17  different direction if I had been the QRT
18  team leader, if I had been the lieutenant
19  who was there in the tier at the time? It's
20  possible, but I cannot say what was in the
21  situation at that time because I was not
22  there.
23     Q.   All right. If I understand
24  you then, they had the option not to use the

Warden Dana G. Metzger                                    Page 72

1   least amount of force necessary.
2      A.   Did they have the option not
3   to use the least amount of force necessary?
4      Q.   Isn't that what you're telling
5   me?
6      A.   They had this option and they
7   used it.
8      Q.   It's not the least amount of
9   force necessary; was it?
10     A.   No. There could have been
11  other options that could have gone, but
12  this is again going around in circles and
13  interpreting the scene how you saw it with
14  the history that you have in saying, did
15  they go to a higher level of response or use
16  of force with your definition?
17     Q.   Why couldn't they have used
18  the MK-9?
19     A.   They could have.
20     Q.   And wouldn't that have been a
21  less use of force than PepperBalls?
22     A.   Yes.
23     Q.   And you can pretty much be
24  assured that he wouldn't have had his eye

Warden Dana G. Metzger     Page 73

1   shot out by a MK-9.
2    **A.   If they used pepper spray, I**
3   **don't see pepper spray poking someone's eye**
4   **out, no.**
5    Q.   So it was a lesser use of
6   force. It could have been used and he
7   didn't use it; right?
8    **A.   They had the option, and they**
9   **chose to use the force that they deemed the**
10   **best way to handle the situation.**
11    Q.   They used the use of force
12   that was more dangerous than one that was
13   available, didn't they?
14    **A.   They used the use of force**
15   **that was made available to them and was**
16   **their option to use.**
17      **They could have used, as I**
18   **stated before, a different array of choices**
19   **to make, but they made this decision.**
20    Q.   They could have used a less
21   dangerous use of force, and they chose not
22   to; would you agree with me on that?
23    **MS. SONG:** Objection.
24      You've already asked the

Warden Dana G. Metzger     Page 74

1   question. He's given you an answer.
2    **MR. HAMPTON:** He's not.
3    **MS. SONG:** Maybe not the
4   answer you want, but he's definitely
5   given you an answer.
6   **BY MR. HAMPTON:**
7    Q.   Well, I want to know an answer
8   to that question.
9      They had other uses of force
10   that they -- other choices in use of force
11   that were less dangerous and they didn't use
12   them; is that correct?
13    **A.   Yes.**
14    Q.   So they chose a use of force
15   that was not the least amount of force that
16   could be used to get the result; correct?
17    **A.   For your interpretation, yes.**
18    Q.   Now, I can't -- I'm not on
19   your end of the video here, so I don't know
20   how well you can hear anything that's
21   happening, but I want to play just a part of
22   where the PepperBalls are being fired and I
23   want to ask you afterwards if you can hear
24   anything that Mock says to Cropper or

Warden Dana G. Metzger     Page 75

1   anything that Cropper says back to Mock.
2   And this will only take a minute or so.
3      (Video is played.)
4   **BY MR. HAMPTON:**
5    Q.   All right. Did you hear
6   anything that Cropper said?
7    **A.   Cropper? No.**
8    Q.   You didn't hear him yelling
9   "stop" over and over again?
10    **A.   I couldn't tell if that was**
11   **"stop."**
12    Q.   But you see his mouth moving?
13    **A.   Barely.**
14    Q.   Was he shouting something?
15    **A.   Yes.**
16    Q.   What did you hear Mock say?
17    **A.   Get down on the ground.**
18    Q.   What was the first instruction
19   he gave?
20    **A.   That is all I could interpret,**
21   **"get down on the ground."**
22    Q.   You didn't hear him at the
23   beginning say, Come to the door and cuff up?
24    **A.   No.**

Warden Dana G. Metzger     Page 76

1    Q.   Let's try again and see if
2   you -- it's at the very beginning -- see if
3   you hear him say that.
4      (Video is played.)
5   **BY MR. HAMPTON:**
6    Q.   Do you hear that?
7    **A.   Yes.**
8    Q.   Now, Cropper was coming up to
9   the door, wasn't he? It's what we just saw
10   in that scene.
11    **A.   I don't know if he was falling**
12   **over or if he had tripped. Was he coming to**
13   **the door --**
14    Q.   Watch.
15      (Video is played.)
16   **BY MR. HAMPTON:**
17    Q.   Now, what I see is he's moving
18   toward the door and Mock never stopped
19   shooting; isn't that true?
20    **A.   It looked like he was going to**
21   **charge the door.**
22    Q.   He says, Come to the door and
23   cuff up.
24      How is he not coming to the

Cropper v McCarthy, et al.                                                6/16/2021 Depo of Franchot Wallace

**45**

1    A.    I don't recall that.

2    Q.    Were you there the whole time until they

3  brought Cropper out of the cell?

4    A.    I was outside of the cell as the team was

5  attempting to extract him.

6    Q.    While they had him on the floor attempting

7  to cuff him, were you aware that Mock reentered the

8  cell?

9    A.    Yes.

10    Q.    And were you aware --

11    A.    Entered, he went in the cell initially. He

12  went in.

13    Q.    All right.  Did he come back out?

14    A.    That, I don't recall.

15    Q.    You don't recall seeing him go in and pepper

16  spray Cropper in his face?

17    A.    No, I don't recall.

18    Q.    Are you instructed on the use of pepper

19  spray of how far away you must be when you're using it?

20  In other words, how close you can get to the individual

21  before you spray them?

22    A.    I've been trained on how to use it, yes.

23    Q.    When you're trained on how to use it, how

24  much distance away are you supposed to be when you use

Cheryl A. Anthony, LLC
(302) 674-8884

**46**

1  it?

2    A.    What happened there?

3        MR. HAMPTON:  Sorry.  Are we still going?

4        MS. SONG:  Yes.

5  BY MR. HAMPTON:

6    Q.    Do you remember the question, sir, about how

7  far away he must be when you're using the pepper spray?

8    A.    Yes.  I said approximately five feet, five

9  to ten feet away.

10    Q.    And it wouldn't be proper to be, say, a foot

11  away from somebody's face when they're on the ground and

12  spray them?

13    A.    No.

14    Q.    Once Cropper was brought out of the cell and

15  he was taken for an evaluation by medical, did you go

16  with the team to medical?

17    A.    Yes.  I believe I did.

18    Q.    Okay.  Did you become aware sometime that

19  day that Cropper had been shot in the eye by a

20  pepperball?

21    A.    I was notified by medical, yes, that his eye

22  was injured.  They didn't tell me how.

23    Q.    Did you find out at some point that he had

24  been shot in the eye by a pepperball?

Cheryl A. Anthony, LLC
(302) 674-8884

**47**

1    A.    They told me it was a possibility that he

2  had been shot in the eye, yes.  But they just told me

3  that his eye was injured.

4    Q.    Did you learn at some time that the globe of

5  his eyeball basically had been ruptured?

6    A.    No.  They didn't go into detail.

7    Q.    Well, did you learn later?

8    A.    No.

9    Q.    Is this the first time that you learned that

10  his eyeball was ruptured?

11    A.    Yes.

12    Q.    And he basically has virtually no vision in

13  that eye?

14    A.    I was told that he had lost his vision, yes.

15    Q.    Had you ever been involved in a QRT before

16  with Sergeant Mock?

17    A.    I believe I have.

18    Q.    Did he use a pepperball launcher in the

19  previously incidence?

20    A.    That, I don't recall.

21    Q.    Do you know if Sergeant Mock has a

22  reputation as to how often he uses pepper spray?

23    A.    No.

24    Q.    If he uses pepper spray, does that generate

Cheryl A. Anthony, LLC
(302) 674-8884

**48**

1  a use of force report?

2    A.    I'm not sure of the question.

3    Q.    If anybody uses pepper spray on an inmate,

4  does that generate a use of force report?

5    A.    Yes.

6    Q.    Okay.  Have you ever read use of force

7  reports with Sergeant Mock using pepper spray?

8    A.    Could you repeat the question?

9    Q.    Have you ever read incident reports that

10  said Sergeant Mock used pepper spray, or have you seen

11  use of force reports where he used pepper spray?

12    A.    I don't recall.  I know he's been on a QRT

13  team.

14    Q.    Captain Kromka, is there another Kromka that

15  was part of the QRT that is not the captain?  Some other

16  correctional officer named Kromka?

17    A.    Yes.

18    Q.    Are they related?

19    A.    Yes.

20    Q.    What's the relation?

21    A.    I believe that was his son.

22    Q.    Was there a particular urgency to have to

23  get Cropper out of that cell?  Was that cell going to be

24  used for somebody else?

Cheryl A. Anthony, LLC
(302) 674-8884

**PA035**

Cropper v McCarthy., et al.                                    8/6/2021 Depo of Jahi White Condensed Transcript & Word Index

---

**17**

1   you're just trying to -- you know, you're just trying to
2   get this guy who's -- you know, to cooperate. You know,
3   I don't know.
4      Q.   Well, from you being there -- let me ask it
5   this way -- was spraying his face directly with pepper
6   spray the least amount of force to be used to get his
7   hands out from under him?
8      A.   No.
9      Q.   After he was shackled up, then he was taken
10  out of the cell to see the nurse.
11     A.   Right.
12     Q.   Did you escort him to see the nurse?
13     A.   Yes. We carried -- At that point we had
14  carried him. He couldn't walk or I think the spray -- I
15  think the pepper spray messed him up. So we carried him
16  into the nurses' office or nurses' station.
17     Q.   All right. Then he was there at the nurse a
18  little bit. And then they said he had to go to the
19  infirmary.
20     A.   Correct.
21     Q.   Did you take him to the infirmary?
22     A.   I believe so. I think we did, because I
23  mean we're part of that QRT. So I'm pretty sure that we
24  escorted him over there.

Cheryl A. Anthony, LLC
(302) 674-8884

---

**18**

1      Q.   After you had him out of the cell, from
2   there until you were out of contact with him, did you
3   hear him saying anything?
4      A.   Not that I -- I mean I'm pretty sure he said
5   some stuff. I don't remember exactly what he was
6   saying.
7      Q.   Did he appear to be in pain?
8      A.   I think -- I think more so just his eyes.
9      Q.   Did you become aware at some point that he
10  had been shot in the eye with a pepperball and that had
11  ruptured his eyeball?
12     A.   Yeah. Later -- I guess when we found out
13  that he -- I believe he went to Kent General or maybe
14  Christiana. I can't remember exactly which one. But
15  that's when I think we all found out.
16     Q.   Have you ever been trained on using
17  pepperball?
18     A.   No.
19     Q.   Other than this event, have you ever seen
20  anybody using pepperball?
21     A.   No. That was my first. That was the first
22  time, at least for me.
23     Q.   Right, right. Had you participated in a QRT
24  with Sergeant Mock before?

Cheryl A. Anthony, LLC
(302) 674-8884

---

**19**

1      A.   No, not that I'm aware.
2      Q.   All right. So if I understand it, Sergeant
3   Mock shot pepperballs, and it appeared that Cropper
4   still did not want to cooperate. Is that how I
5   understand it? Is that correct?
6      A.   Yes, yes.
7      Q.   So when you did go in, you were able to get
8   him down off the bed pretty directly and the only issue
9   left --
10     A.   Right.
11     Q.   -- was getting his hands shackled. Right?
12     A.   Correct.
13     Q.   Could you have done that without the use of
14  pepperball?
15     A.   Without pepperball?
16     Q.   Yes.
17     A.   I believe, yeah, I believe we could have.
18     Q.   All right. When you're in QRT, does
19  somebody in the team have pepper spray with them?
20     A.   No, typically we all like -- excuse me. We
21  all, you know, take our pepper spray and stuff. I don't
22  know if the -- I don't know if the guy who carries
23  pepperball, if he's supposed to carry pepper spray as
24  well. But I know I definitely didn't have it.

Cheryl A. Anthony, LLC
(302) 674-8884

---

**20**

1      Q.   So it's not part of your QRT gear?
2      A.   No.
3      Q.   But Sergeant Mock obviously did have it,
4   because he sprayed Cropper, correct?
5      A.   Correct. But yeah, I don't know if
6   that's -- I don't know. Like I said, I don't know if --
7   I haven't been trained on pepperball --
8      Q.   Right.
9      A.   -- and I don't know if they're supposed to
10  use pepper spray on them, as well. So I'm not sure.
11     Q.   Right. Well, I'm not asking about the
12  rules. I mean he did have it, correct?
13     A.   Yeah, correct.
14     Q.   And would there have been a reason that you
15  saw that he could not have walked into the cell and
16  sprayed Mr. Cropper with pepper spray?
17     A.   I'm sorry. Say that again?
18     Q.   Was there anything that you saw that would
19  make you believe that Mock could not have just walked
20  into Cropper's cell and sprayed him with pepper spray?
21     A.   Yeah. I think at that point, I don't think
22  we needed it. But everything's moving so fast, so I
23  mean I guess he used his judgment. I don't know.
24     Q.   Have you had any experience with Mr. Cropper

Cheryl A. Anthony, LLC
(302) 674-8884

**PA036**

Cropper v McCarthy, et al.                                   8/2/2021 Depo of William Curtis Howard, III

**Page 49**

1 or to be confronted, usually we are not there to be
2 present.
3    Q.    All right.  After that a use of force report
4 was completed.  Did anybody speak to you about the use
5 of the force when they were doing the use of force
6 report?
7    A.    No.  No, I do not recall anybody approaching
8 me about the use of force.
9    Q.    Were you aware at some point by somebody
10 telling you that Mr. Cropper's eyeball was ruptured?
11    A.    Can you repeat that, please?
12    Q.    Did you become aware at some point that
13 Mr. Cropper's eyeball was ruptured by a pepperball?
14    A.    Yes.
15    Q.    And I'm thinking you have never been shot in
16 the eye with a pepperball.  That would be a correct
17 assumption, wouldn't it be?
18    A.    Yes.  I have never been shot with a
19 pepperball in my eye.
20    Q.    And not having done it, we can both agree or
21 imagine, can't we, that that would be extremely painful?
22    A.    Oh, definitely, it would be extremely
23 painful.
24    Q.    And that might make somebody more capable to

**Page 50**

1 cooperate than it would have been had they not been shot
2 in the eye?
3    A.    Could you repeat that?  You went in and out.
4    Q.    It wasn't a great question.  But essentially
5 what I'm trying to say is that after Mr. Cropper was
6 shot in the eye with the pepperball, his attention
7 probably was focused on that eye as opposed to be being
8 able to cooperate.  Is that a just a mere statement that
9 I've said?
10    MS. SONG:  Objection to form.
11    THE WITNESS:  Am I allowed to speak on that?
12    MR. HAMPTON:  Yes, you can answer.
13    THE WITNESS:  Well, I don't think I'm going
14 to be necessarily --
15    MS. SONG:  You can answer, Mr. Howard,
16 although there is no question.
17    THE WITNESS:  Right.  And I basically just
18 want to speak on the fact that if I was in that
19 situation -- and I'm just going to put myself in that
20 situation because I've been involved in that outside
21 here, before starting here.  There is a point in time
22 where an individual, based on pain tolerance, just says:
23 I've had enough.
24    So if I was to put myself in that situation
Cheryl A. Anthony, LLC
302-674-8884

**Page 51**

1 and I were to have been shot in the eye with a
2 pepperball, I would have fell right to my knees, fell
3 right to the ground, and just gave in.
4    Q.    Mr. Cropper, if he was yelling stop and he
5 continued to be shot, might that affect his decisions as
6 to what to do from there on?
7    MS. SONG:  Objection to speculation.
8    (Following a discussion off the record:)
9 BY MR. HAMPTON:
10    Q.    All right.  The last couple of questions
11 were pretty confusing because of the break-up in the
12 sound.
13    Make sure I understand, though.  You were
14 not called to any disciplinary hearing for Mr. Cropper,
15 and you were not interviewed for any use of force
16 report; is that correct?
17    A.    Correct.
18    MR. HAMPTON:  Well, sir, I'm not going to
19 ask any more questions.  Sorry about the difficulty at
20 the end.
21    The other attorney may ask you some if she
22 wants to.
23    MS. SONG:  I don't have any questions for
24 Mr. Howard.  We'll read.
Cheryl A. Anthony, LLC
302-674-8884

**Page 52**

PLEASE REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE WITNESS.

Cheryl A. Anthony, LLC
302-674-8884